STATE OF CONNECTICUT *v.* NABIL KADDAH
(SC 15637)

Callahan, C. J., and Norcott, Katz, Palmer and McDonald, Js.

Argued April 29—officially released September 7, 1999

1036, 110 S. Ct. 757, 107 L. Ed. 2d 774 (1990); *Doe* v. *Heintz,* 204 Conn. 17, 35, 526 A.2d 1318 (1987).

*Glenn M. Falk,* special public defender, for the appellant (defendant).

*Frederick W. Fawcett,* senior assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict,* state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. After a jury trial, the defendant, Nabil Kaddah, was found guilty of murder in violation of General Statutes § 53a-54a,[1] attempted murder in violation of General Statutes §§ 53a-49[2] and 53a-54a, and unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a).[3] The trial court sentenced the defendant to a total effective sentence of seventy-five years imprisonment.

The defendant has appealed his conviction directly to this court.[4] On appeal, he raises two claims: (1) the

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[2] General Statues § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

[4] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony,

trial court improperly excluded expert testimony regarding his ability to read and comprehend English; and (2) the trial court improperly rejected the defendant's supplemental request to charge regarding the affirmative defense of extreme emotional disturbance. We reject both of the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Between 3 and 3:30 a.m. on August 27, 1994, the defendant, while driving his gray Pontiac Grand Prix, approached Leanne Kollar on Middle Street in Bridgeport. Kollar, who was working as a prostitute, entered the defendant's car in anticipation of engaging in sex for money. The defendant drove around Bridgeport, eventually stopping on Salem Street. He turned off the engine and locked the doors to the vehicle. The defendant then began to choke Kollar, telling her that, if she removed her clothes, he would not hurt her. Kollar began to undress, and the defendant reclined her seat back and started to choke her again. Kollar managed to open the car door in an attempt to escape, and the defendant began hitting and punching her. They both rolled out of the car together, after which the defendant kneeled over Kollar and continued strangling her. After hitting the defendant and knocking the defendant's eyeglasses off his face, Kollar was able to flee to a nearby house. The defendant then drove away.

When the police arrived, Kollar gave them a description of the defendant and told the officers where the defendant lived, as she had been to his apartment on prior occasions. The police went to the defendant's apartment and waited for him to return. Meanwhile, the defendant returned to Middle Street and picked up Jennifer Williamson, another prostitute. The defendant

or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

drove to the corner of Maplewood and Laurel Avenues, where he and Williamson engaged in a physical struggle. The defendant hit Williamson, bit her on the back and strangled her. During the struggle, Williamson stopped moving and the defendant pushed her out of the car and drove away.

Sara Iza, a resident of Laurel Avenue, saw the defendant's car on Maplewood Avenue at approximately 5:30 a.m. on August 27, 1994. When her husband, Luis Iza, went outside to start his car at approximately 6 a.m., he saw Williamson's naked body lying in the street, in the same spot where Sara Iza had seen the defendant's car stop earlier. Malka Shah of the office of the chief medical examiner testified that Williamson died from asphyxia, which had been caused by strangulation.

At his trial, the defendant raised the defenses of mental disease or defect[5] and, alternatively, extreme emotional disturbance.[6] The jury rejected these defenses and found the defendant guilty of the murder of Williamson and the attempted murder and unlawful restraint of Kollar.

I

On appeal, the defendant first claims that the trial court improperly excluded expert testimony from Margaret Cooney, a teacher of English as a second language

---

[5] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[6] General Statutes § 53a-54a (a) provides in relevant part: "[I]t shall be an affirmative defense [to the crime of murder] that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

at the University of Bridgeport, regarding the defendant's ability to comprehend the English language. The defendant claims that, because his native tongue is Arabic and he is limited in his ability to understand English, Cooney's testimony was relevant to shed light on the circumstances surrounding the statements he had given to the police.

The following additional facts are relevant to the disposition of this claim. Before the trial began, the defendant moved to suppress his statements to the police, claiming, inter alia, that he did not knowingly and intelligently waive his *Miranda*[7] rights, and that his statements were not voluntary. The circumstances surrounding the defendant's interview with the police are as follows. After the defendant returned home at approximately 5:45 a.m. on August 27, 1994, the police drove him to a local hospital, where Kollar identified him as her assailant. The police then drove the defendant to the police station and, later that day, brought him into an interview room and read him his *Miranda* warnings. The defendant stated that he understood his rights and signed a waiver form. During questioning about the incident involving Kollar, the defendant admitted that he had picked up a woman that morning and had tried to have sex with her, but when she mentioned that she wanted money, the defendant had told her that he does not "pay money for sex." The defendant admitted that an altercation ensued, and that the woman had fled the vehicle. Prior to questioning the defendant about the incident involving Williamson, the detectives read the defendant his *Miranda* warnings again, and had asked him to sign another *Miranda* waiver form, which he did. The defendant then admitted that he had picked up another woman, and that they also had fought over money. The defendant stated that he had struggled with her in the car and, when she appeared to be unconscious, he removed her from the

[7] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

car and left her on the pavement. After giving this information to the police, the defendant agreed to go over the incidents again with a tape recorder in the room.

At the suppression hearing, Cooney testified with respect to the defendant's grasp of the English language. She stated that, after the defendant had been arrested, she administered a generally accepted achievement test to the defendant. The test results indicated that, while the defendant's conversational English was good, his ability to comprehend written English was "[v]ery, very poor." Cooney also testified that she had reviewed the notice of rights form that the defendant had signed before giving his statements to the police. She stated that, based upon the defendant's performance on the standardized test she administered, the defendant probably had not understood many of the words included in the waiver form. Specifically, Cooney concluded that the defendant would not understand the meaning of "authorize," "consent," "voluntarily," "constitutional" and "waiver." Cooney also stated that she had reviewed the tape recording of the defendant's interview with the police and found it significant that he had answered "yes" to every question when the police officers asked him if he understood his rights.[8] Cooney stated that "it

---

[8] In the tape-recorded interview, Inspector John F. Solomon of the state's attorney's office questioned the defendant regarding his rights as follows:

"[Q.] . . . We filled some forms out and advised you of your rights. Do you understand that?

"[A.] Yeah.

"[Q.] And did you understand all your rights when we advised you of them? Did you understand those rights?

"[A.] Yeah, I understand them.

"[Q.] Okay. I'm going to read them to you again, okay? And you signed both these forms that I show you here?

"[A.] Yeah.

"[Q.] Okay. Lieutenant [Richard] Petitte [of the Bridgeport police detective bureau] advised you of them. I just want to read them again to you. It says here, I have been advised and know that I have a right to remain silent. Do you know that and understand that? Okay. It says I have been advised and know that anything I say can be used against me in a court of law. Do you understand that? Can you respond by answering?

is very common for people of limited English abilities to answer yes to every question" that they do not understand. She concluded that the defendant "probably . . . did not understand" the waiver form that he had signed before speaking with the police.

The trial court denied the defendant's motion to suppress his statements. The court concluded that the state had met its burden of proving that the defendant "understood [his rights] and intelligently waived them." The court further concluded that the defendant's statements were voluntary because there was "nothing coercive or threatening in the [officers'] conduct . . . ." The admissibility of the defendant's statements to the police is not at issue in this appeal.

At trial, the defendant attempted to offer Cooney as a witness and the state filed a motion in limine to exclude her testimony.[9] The defendant argued that Cooney's testimony would demonstrate that, in making his statements to the police, the defendant merely went along with the version of events fed to him by the police, and that it would shed light on the "physical and psychological environment that yielded the [defendant's] confession . . . ." *Crane* v. *Kentucky*, 476 U.S. 683, 689, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986).

"[A.] Yes.

"[Q.] Okay. I've been advised and know that I have a right to an attorney and know that the attorney can be with me while being questioned. Do you understand that?

"[A.] Yes.

"[Q.] I've been advised and know that if I cannot afford an attorney, one can be appointed for me and I may have him with me before answering any questions. Do you understand that?

"[A.] Yes.

"[Q.] Okay. I've been advised and know that if I refuse to answer questions or I may stop answering questions at any time if I so desire. Do you understand that? Any time you want to stop talking, you just say so.

"[A.] Yes."

[9] The court did not require an offer of proof from Cooney; instead, as agreed by the parties, the court used her testimony from the suppression hearing to determine whether she could testify at trial.

The trial court granted the state's motion to exclude Cooney's testimony. Distinguishing *Crane*, the court concluded that Cooney's testimony did not shed light on the physical and psychological circumstances under which the defendant made his statements to the police, but, instead, concerned the defendant's understanding and waiver of his *Miranda* rights.

On appeal, the defendant argues that the trial court improperly excluded Cooney's testimony, which was relevant under *Crane*. The state counters that Cooney's testimony was not relevant to any issue before the jury. We need not resolve this issue, however, because we conclude that, even if the evidence was relevant, the court's ruling excluding Cooney's testimony was harmless.

In *Crane*, the United States Supreme Court held that the accused improperly was prohibited from presenting evidence regarding the circumstances surrounding his confession. Id. The court also stated that "the erroneous ruling of the court is subject to harmless error analysis." Id., 691, citing *Delaware* v. *Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). "The correct inquiry is whether, assuming that the damaging potential of the [court's ruling] were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware* v. *Van Arsdall*, supra, 684.[10]

The defendant in this case claims constitutional error based on the United States Supreme Court's holding in

---

[10] In his concurring opinion in *Van Arsdall*, Justice White observed that a ruling within the trial court's wide latitude concerning a marginally relevant issue becomes a constitutional violation only if the outcome of the trial would have been different. *Delaware* v. *Van Arsdall*, supra, 475 U.S. 685–86 (White, J., concurring).

*Crane.*[11] We, therefore, require the state to establish any such error to be harmless beyond a reasonable doubt. E.g., *State* v. *Webb,* 238 Conn. 389, 482, 680 A.2d 147 (1996) (state bears burden of proving constitutional error was harmless beyond reasonable doubt); *State* v. *Cavell,* 235 Conn. 711, 720, 670 A.2d 261 (1996) (same); see *Chapman* v. *California,* 386 U.S. 18, 23, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). "Whether . . . an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Delaware* v. *Van Arsdall,* supra, 475 U.S. 684.

We conclude that the state has met its burden and has demonstrated that the error, if any, of excluding Cooney's testimony was harmless beyond a reasonable doubt. Cooney's testimony was not important either to the defendant's case or the state's case. The record reveals that the defendant did not contest the fact that Kollar and Williamson were in his car with him on separate occasions that night, nor that he had had altercations with both of them. His defense consisted of testimony concerning his mental state. At trial, James Merikangas, a psychiatrist and neurologist called by the defendant, testified concerning the validity of the defendant's statements to the police, stating that they resulted from confabulation, which is a "mental defect where[by] someone who has a poor or missing memory

[11] We note that the defendant has not raised a separate claim under the state constitution. We, therefore, limit our analysis to the federal constitutional provisions. E.g., *State* v. *Beltran,* 246 Conn. 268, 277 n.7, 717 A.2d 168 (1998).

thinks that they have a memory and will tell you what happened when it didn't. . . . It is a false memory. It is not a lie. It is a belief the patient has which simply has no basis in fact." Merikangas then concluded that "[the defendant] was really not aware of what was happening, and that if there were statements made later, either confabulation or things that had been told to him, that [the defendant] was not the most reliable witness at that time."

With respect to the issue of the defendant's mental state, there was no indication that Cooney, who was not a psychiatrist, would testify that the defendant's statements resulted from confabulation or repetition. Cooney's testimony that people with minimal English speaking abilities tend to answer "yes" to questions they do not understand would not have supported his defense because Cooney would have testified that the terms the defendant did not understand related to his *Miranda* rights.[12] The defendant's statements to the police, which consisted of questions and answers, contained no such terms; the questions were narrative and descriptive, and the defendant often answered "no" to those questions.[13] Cooney's testimony would not have

_____

[12] As the many conflicting court decisions resulting from *Miranda* reveal, learned judges have struggled with the terms used in *Miranda* warnings and have arrived at conflicting interpretations. Cf. *State* v. *Anonymous*, 240 Conn. 708, 721 n.15, 694 A.2d 766 (1997).

[13] In excerpts of the tape-recorded interview, Inspector John F. Solomon of the state's attorney's office questioned the defendant concerning the incidents as follows:

"[Q.] Can you go on and tell me like you did before what happened last night with the first girl?

"[A.] Uh, I found her, I don't know where. The first one.

"[Q.] Okay.

"[A.] Uh, I was driving and I asked her to come with me in the car and she came into the car. I asked her for sex.

"[Q.] For sex?

"[A.] Yeah.

"[Q.] Okay.

"[A.] Uh, she said okay and she took her clothes off. When I tried to start to do something with her she asked me about money and I told you, I don't

been important to the issue of the defendant's mental
pay money for sex.

"[Q.] You don't pay money?

"[A.] For sex? No.

"[Q.] Okay.

"[A.] We fight together and she left the car.

"[Q.] Okay.

"[A.] I tried to keep her in the car, but I couldn't. She left.

"[Q.] You said you tried to keep her in the car? Was that by fighting with her?

"[A.] What?

"[Q.] Was that by fighting with her? You told me something before—

"[A.] No. I pull her. I was talking with her, but she left because she saw I don't pay anything.

"[Q.] You don't pay any money?

"[A.] No.

"[Q.] Okay. And the—when she got out of the car, how was she? Was she dressed or undressed?

"[A.] No. Undressed.

"[Q.] She was undressed? And where were her clothes when she got out of the car?

"[A.] She left it in my car.

\* \* \*

"[Q.] Did you punch her at all?

"[A.] I don't remember because she start to fight with me. I don't remember if I punch her or hit her. I don't remember.

"[Q.] Did you at any time try to choke her? Do you remember doing that?

"[A.] No.

"[Q.] When she got out of your car, what did you do?

"[A.] I start my car and I left.

"[Q.] You started your car and you left. And do you remember where this occurred, where she got out of your car? Can you remember at all?

"[A.] No.

"[Q.] The area? You don't have any idea where it was?

"[A.] I don't remember the area.

"[Q.] Can you describe that girl for me, a description of her?

"[A.] I can't. I'm not sure. I don't know.

\* \* \*

"[Q.] Can I ask you now, when you leave from there and you left and her clothes were still in your car, where did you go next?

"[A.] I was driving anywhere. I don't know.

"[Q.] What time? Give me a time frame. Do you remember what time this was when this incident happened with the girl, approximately?

"[A.] Maybe three o'clock.

"[Q.] About three . . . in the morning?

"[A.] Yeah.

"[Q.] And what do you recall happened next? Where did you go?

"[A.] I was driving. I don't know where I did go. I just know I was driving. Uh, I feel, I was feel tired and I want to sleep, but I don't know how I went to downtown and I saw the other one.

"[Q.] You saw the other girl that we talked about earlier?

"[A.] Yes.

\* \* \*

"[Q.] What happened then? What happened with this girl? I mean, did you pick her up or what happened?

"[A.] Yes. She came in my car.

"[Q.] She got into your car?

"[A.] Yeah.

"[Q.] Okay.

"[A.] And we start to talk, before she took her clothes off, and then, I don't know. I was driving. I stopped. I parked my car; I don't know where. And we moved to the backseat with her. She took off her clothes. I don't know. I tried to kiss her or something. Also, she asked me about money and I told her the same thing. I don't, I, I don't pay money for sex. Maybe I told her. I don't know exactly, but because I know I don't pay money for sex. I tried to make sex with her. She doesn't want. Then, I don't know how she hit me in my eyes and this moment I feel pain in my eyes. I don't remember. I, I hit her and she bite me.

\* \* \*

"[Q.] Okay. And then what happened?

"[A.] I start to hit her, punch her. I don't know. I don't remember exactly until I saw her, is no—she doesn't move. When I saw her, you know, I feel scared. She doesn't move, she doesn't talk. So what I can do. I pull her outside the car and I put her in the street.

"[Q.] Was she clothed or unclothed at this time? Did she have her clothes off or on?

"[A.] Off.

"[Q.] Her clothes were off?

"[A.] Yes.

"[Q.] Do you remember something else that you told me you did to her before? What did you do to her besides punch and hit her?

"[A.] I don't know. Maybe you help me. What did I say?

"[Q.] You had said before you had done something to her and you pointed to a location on her body where you had done this. You had indicated that you had bitten her. Do you remember saying that?

"[A.] Yah, yah, yah, yah.

"[Q.] Okay. Where did you bite her?

"[A.] In her back.

"[Q.] In her back? What part of the back did you bite her on?

"[A.] On the side.

"[Q.] Well, you pointed before. Can you point right now to myself as I turn my back?

"[A.] I think here, in this area.

"[Q.] You're pointing toward my right side on the back, close to my

state because the focus of Cooney's testimony was on an entirely different issue.

As to the evidence at trial of the defendant's English language abilities, the jury heard testimony regarding the defendant's ability to converse in English and listened to the tape recording of the defendant's interview with the police. Inspector John F. Solomon of the office of the state's attorney, who participated in the interview of the defendant, stated that, while the defendant had an accent, it "appeared evident that he understood what

---

shoulder, below my shoulder. Is that where?

"[A.] Yes.

"[Q.] Is that where you recall biting this young lady?

"[A.] Yeah.

"[Q.] And do you remember how many times you bit her?

"[A.] I told you, maybe one time, maybe more. I don't remember.

"[Q.] But you definitely—you're certain that you bit her, though?

"[A.] Yeah.

"[Q.] And then you said you took her from the backseat and you took her out of the car. And just how did you take her out of the car? Do you remember?

"[A.] What?

"[Q.] How did you get her out of the car?

"[A.] I pull her.

"[Q.] You pulled her out?

"[A.] Yeah.

"[Q.] And you left her on where? The pavement? I mean, do you know if it was the sidewalk or the road, or grass?

"[A.] I don't remember, but I think in the side, on the side of the street.

"[Q.] On the side of the street?

"[A.] Yeah.

"[Q.] Okay. Now let me ask you. Do you know, when you left her there, whether she was alive or not? Was she dead or alive? Do you know that, or was she unconscious?

"[A.] I don't know.

"[Q.] You have no idea?

"[A.] No.

"[Q.] Did she move or anything after you put her on there? Was she moving?

"[A.] After I put her in the street?

"[Q.] Yes.

"[A.] I don't know, because I, I took my car and I left.

"[Q.] You just drove away?

"[A.] Yes."

was being asked of him." Lieutenant Richard Petitte of the Bridgeport police detective bureau stated that, in his conversations with the defendant regarding his statements, the defendant did not have a hard time understanding English words. To the contrary, Isam Araboghli, a friend of the defendant, testified that the detectives had told him that they did not understand the defendant very well, and Merikangas described the defendant as "a man that doesn't understand or speak English very well . . . ." If Cooney had testified, she would have stated that the defendant's oral English skills were good. Cooney's testimony, at best, would have bolstered the testimony of Solomon and Petitte.

Moreover, the overall strength of the state's evidence was overwhelming. See, e.g., *United States* v. *Young*, 470 U.S. 1, 20, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (error in prosecutor's remarks harmless due to overwhelming evidence of defendant's guilt). Bridgeport detectives testified that, when they searched the defendant's vehicle pursuant to a warrant, they had found women's clothing on the floor of the front passenger seat. Kollar identified some of the clothing found in the defendant's car as her own, and she made an in-court identification of the defendant as her assailant. Williamson's boyfriend testified that he had seen Williamson enter the defendant's car that night, and that it was the last time he saw her alive. He also identified some of the clothing found in the defendant's vehicle as that which Williamson had been wearing on the night of her murder. Luis Iza discovered Williamson's body in the exact location where his wife, Sara Iza, had seen the defendant's car. In addition, the police had found identical brown stains, which appeared to be vomit, on Williamson's body and in the defendant's vehicle. The autopsy revealed that there were bite marks on Williamson's back, and a forensic odontologist testified that the structure of the defendant's teeth was consistent with those marks.

For the foregoing reasons, we conclude that any error in excluding Cooney's testimony was harmless.

## II

The defendant's second claim is that the trial court improperly denied his supplemental request to charge the jury that, in considering the affirmative defense of extreme emotional disturbance, the victim need not be the cause of the perpetrator's distress.

The following additional facts are relevant to the resolution of the defendant's second claim. At trial, the defendant adduced testimony establishing that, three months prior to the assaults, his wife had been shot in the chest during a robbery at a convenience store and she had remained hospitalized with serious injuries. He also presented evidence that, one week prior to his arrest, he had been attacked by an unknown individual and that the resulting injury required fifty-two stitches in his back. There was testimony that, on the night in question, the defendant had been drinking heavily and was very upset about the recent loss of his passport. Merikangas testified that the defendant also suffered from brain damage, hypoglycemia and epilepsy. Merikangas further testified that alcohol interferes with an epileptic's ability to modulate behavior, and that the combination of low blood sugar and alcohol could inhibit the nervous system to the extent that a person "would not know what he was doing." Merikangas concluded that, based upon all the stresses in his life at the time, the defendant was suffering from extreme emotional disturbance at the time of the incidents. The state then offered Karen Brody, a psychiatrist, as a rebuttal witness. Brody acknowledged the stresses in the defendant's life, but concluded that the defendant did not act under extreme emotional disturbance. Brody also testified that she was not aware of any case in

which violence caused by extreme emotional disturbance was directed toward a third person who did not cause the underlying stresses.

Defense counsel then stated in closing argument: "Well, I would submit to you the court will charge you on extreme emotional disturbance, and you can listen to the judge's charge and find out whether or not in order to qualify for that legal concept it is necessary for the person who explodes to explode against the person who is causing the problem or against someone who happens to be there after they brood for a long time and then explode as if without any provocation." Outside the presence of the jury, the court informed counsel that, in giving its charge on extreme emotional disturbance, it did not intend to address whether the victim must be the cause of the stress. The defendant then submitted a supplemental request to charge that provided: "In considering the defense of extreme emotional disturbance, it is not necessary that the victim(s) of the Defendant's acts be the person who caused the emotional distress to the Defendant. The law provides that the defense is available to the Defendant even when a third party who is unconnected to the cause of the emotional disturbance, is the victim of the Defendant's act." The court refused to give this instruction, concluding that its intended charge[14] was legally accurate and

---

[14] The court concluded its instructions on extreme emotional disturbance as follows: "Extreme emotional disturbance is composed of the following three elements. It must have been proven . . . by the defendant by a fair preponderance of the evidence . . . (1) that . . . at the time the defendant intentionally caused the death of . . . Williamson, he acted under the influence of an emotional disturbance; (2) that such emotional disturbance was extreme; and (3) that under all the circumstances as the defendant believed them to be there was a reasonable explanation or excuse for such extreme emotional disturbance influencing his conduct. . . .

"While the emotional disturbance need not necessarily have been a spontaneous or sudden occurrence or caused by any particular provoking event, indeed [it] may have simmered in the defendant's mind for [a] long period of time, the disturbance must actually have influenced his conduct at the time of the killing."

that the element of "reasonableness" addressed the substance of the defendant's request.

On appeal, the defendant contends that, while the trial court's instruction was legally correct, it misled the jury by failing to address whether extreme emotional disturbance must be caused by the victim of the crime. Because defense counsel already had told the jury that the court might provide guidance on whether the victim must be the cause of extreme emotional disturbance, the absence of any instruction on this issue was reversible error. We disagree.

"[A] request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given." (Internal quotation marks omitted.) *State* v. *Payne*, 240 Conn. 766, 781, 695 A.2d 525 (1997). "A refusal to charge in the exact words of a request will not constitute error if the requested charge is given in substance." (Internal quotation marks omitted.) *State* v. *Gant*, 231 Conn. 43, 47, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). "A jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present." (Internal quotation marks omitted.) *State* v. *Payne*, supra, 781. "The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Ash*, 231 Conn. 484, 494, 651 A.2d 247 (1994).

We conclude that the trial court's instruction on extreme emotional disturbance did not mislead the jury or result in any injustice. The court adequately instructed the jury on the affirmative defense of extreme emotional disturbance and did not imply, in

any manner, that the extreme emotional disturbance must be caused by the victim. The court instructed the jury: "It is your responsibility as the trier of fact to decide to what extent, if any, the defendant's emotions governed his conduct at the time of the death of . . . Williamson. In reaching this decision, you may consider all of the feelings which you find in fact influenced the defendant's conduct, for example, passion, anger, distress, grief, resentment, fright, hatred, excessive agitation, or other emotions.

*"While the emotional disturbance need not necessarily have been a spontaneous or sudden occurrence or caused by any particular provoking event, indeed [it] may have simmered in the defendant's mind for [a] long period of time, the disturbance must actually have influenced his conduct at the time of the killing."* (Emphasis added.) The court's charge made clear that the "provoking event" need not cause a "spontaneous or sudden" emotional disturbance, and that such a disturbance "may have simmered in the defendant's mind for [a] long period of time . . . ." The reference to an "event" as a cause and the long, *simmering* nature of such a disturbance suited the defendant's evidence. It removed any possibility that the jury mistakenly would believe that the victim, rather than the circumstances, contemporaneously must have caused the defendant's disturbance for the defense of extreme emotional disturbance to apply. Furthermore, Brody's testimony that she never had seen a case in which the victim did not cause the disturbance was merely testimony and not an instruction as to the law. The trial court's charge, as given, adequately instructed the jury on the affirmative defense of extreme emotional disturbance. Thus, there was no need for the trial court to include the language

in the defendant's supplemental request in its charge to the jury.[15]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[15] Moreover, the defendant did not file his request to charge concerning the defense of extreme emotional disturbance in a timely manner. The defendant's supplemental request to charge was submitted only after closing arguments. According to Practice Book § 42-17, "[w]ritten requests to charge the jury must be filed . . . before the beginning of the arguments or at such earlier time during the trial as the judicial authority directs . . . ."