STATE OF CONNECTICUT *v.* JOSE AVILES
(SC 17055)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued October 18, 2005—officially released February 21, 2006

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Terence Mariani*, assistant state's attorney, with whom, on the brief, was *John A. Connelly*, state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Jose Aviles, appeals from the judgment of conviction, rendered after a jury trial, of murder and criminal possession of a pistol or revolver. The defendant raises two issues on appeal, namely, that the trial court improperly: (1) denied his motion to suppress certain evidence gathered by the police following their warrantless entry into a private residence in which the defendant was staying as an overnight guest; and (2) instructed the jury regarding his affirmative defense of extreme emotional disturbance. We affirm the judgment of the trial court.

The defendant was charged with murder in violation of General Statutes § 53a-54a (a),[1] and criminal posses-

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

sion of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1).[2] Prior to trial, the defendant moved to suppress certain admissions and other oral and written statements he had made to police following their entry into the residence, the gun used in the murder, the shirt and bandana that the defendant allegedly wore at the time of the shooting, and certain clothing found by the police on the day following the murder. After an evidentiary hearing, the trial court granted the defendant's motion only as to the bandana, and denied the motion as to the remainder of the evidence. Following the jury's guilty verdict, the court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective sentence of fifty years of imprisonment. This appeal followed.

The jury reasonably could have found the following facts. On the evening of May 15, 2001, the defendant, who was a nineteen year old drug dealer, was in the area of Grove and Willow Streets in Waterbury, which was the neighborhood where he carried out his drug trade. The victim, Robert Dixon, and his friend, Dyenne Martell, were walking in the same neighborhood looking to purchase narcotics. Following a dispute over a drug sale, the defendant, aided by a number of his associates, attacked the victim. The victim was severely beaten and hit on the head with a rock or cinder block, causing him to bleed profusely and to become disoriented. After the fight, Martell led the victim to a barber shop approximately one block away to care for his injuries and to await an ambulance. As Martell was caring for the victim, the defendant left the scene of

[2] General Statutes § 53a-217c (a) provides in relevant part: "A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony or of a violation of subsection (c) of section 21a-279 or section 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d . . . ."

the altercation and retrieved from an abandoned house a loaded gun that he used regularly for protection.

Soon thereafter, the defendant, armed with the gun and wearing a yellow bandana over his face, returned to the area of the fight and approached the victim, who was in the presence of Martell and a number of other bystanders. From close range, the defendant fired one shot at the victim that struck him in the chest and ultimately resulted in his death. Subsequently, the defendant ran away from the scene of the shooting to an apartment at 7 Cossett Street in Waterbury, where he admitted to a number of people that he had shot the victim.

At approximately 8 p.m., the police arrived at the scene of the shooting and found the victim seriously injured. The police began to search for the defendant, who was their prime suspect based on identifications made by the bystanders who had witnessed the shooting. The police continued their investigation throughout the night, and early the next morning, they located Darain Romero, who they believed possessed firsthand knowledge about the shooting and the defendant's current whereabouts. At approximately 8 a.m. the following day, Romero gave the police a statement in which he described having witnessed the defendant shoot the victim. Romero also told police that, following the shooting, he had been with the defendant earlier in the morning at an apartment at 7 Cossett Street in Waterbury and overheard the defendant say that he had shot the victim because the victim "was trying to steal weed from him," and that he would not get caught because he "was going to keep hiding out."

The police went to the Cossett Street apartment, where they located the defendant in a bedroom. The police took the defendant to the police department where he was advised of and waived his rights under

*Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant confessed, both orally and in writing, to having shot the victim, and led the police to the gun that he used to shoot the victim, as well as the shirt he was wearing at the time of the incident, both of which he had hidden in a park near the scene of the shooting. The police also seized the bandana that the defendant had been wearing at the time of the shooting, and the jeans and boots that the defendant was wearing when he was brought to the police station. At approximately 8 p.m. on the day after the shooting, as the defendant was being led into the booking area of the police department, he encountered some young men in the holding area whom he recognized, and they commented about the shooting. Specifically, they asked the defendant why he had shot the victim, to which he responded, " 'Yo, I'm glad I shot him.' " Additional facts and procedural history will be set forth as necessary.

## I

## THE MOTION TO SUPPRESS

The defendant first claims that the trial court improperly denied his motion to suppress all of his statements to the police, both oral and written, as well as the gun and the clothing that the police seized following his apprehension at the Cossett Street apartment. Specifically, the defendant contends that the trial court improperly applied the exigent circumstances exception to the requirement that searches and seizures be accompanied by a warrant; therefore, the warrantless seizure of the defendant in the bedroom of the private residence where he was staying as an overnight guest violated his constitutional rights.[3] We disagree.

---

[3] Although we have held that article first, § 7, of the Connecticut constitution provides greater protection than the fourth amendment of the federal constitution regarding the application of the exclusionary rule to illegal warrantless home arrests; compare *State* v. *Geisler*, 222 Conn. 672, 690, 610 A.2d 1225 (1992) (under state constitution, exclusionary rule requires

The following additional procedural history and facts are relevant to our analysis of this claim. The defendant moved to suppress as evidence all of his oral and written statements, the gun, and his items of clothing, on the basis that all of this evidence had been gathered as a result of a warrantless entry into his temporary residence at 7 Cossett Street, as well as his ensuing warrantless arrest, both of which violated his rights under the fourth and fourteenth amendments to the United States constitution, and article first, § 7, of the Connecticut constitution. After a full evidentiary hearing, the trial court denied the motion as to all of the evidence except the yellow bandana.[4] In particular, the trial court ruled that the exigent circumstances exception to the warrant requirement applied. The court further ruled that the defendant had a reasonable expectation of privacy in the bedroom where he was staying as an overnight guest, and that the police had entered the apartment with consent, but that the consent did not extend to the bedroom, "so that the state would have to show exigent circumstances to enter that room." In this regard, the court concluded that the exigent circumstances exception applied to the entry of the police into the bedroom because, "based on the collective knowledge of the police . . . it was reasonable for the police to conclude that if they did not enter that

suppression of evidence derived from unlawful warrantless entry into home unless taint of illegal entry attenuated) with *New York* v. *Harris,* 495 U.S. 14, 20–21, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990) (under federal constitution, evidence obtained away from home following unlawful warrantless arrest in home need not be suppressed if police had probable cause to make warrantless arrest); this case does not concern that distinction. Moreover, the standard of reasonableness governing police conduct under the exigent circumstances doctrine is the same under both constitutions. *State* v. *Blades,* 225 Conn. 609, 623–24, 626 A.2d 273 (1993). We, therefore, consider the propriety of the entry into the bedroom where the defendant was staying under both the federal and state constitutions.

[1] The validity of the trial court's conclusion with respect to the admissibility of the defendant's yellow bandana is not before us in this appeal.

bedroom in an attempt to locate the firearm . . . life and property could have been endangered, and evidence . . . could [have been] destroyed, and, in fact, the defendant could have fled."

The trial court found the following facts in support of its ruling. Martell identified a photograph of the defendant as the shooter and provided the police with a statement describing the altercation between the victim and the defendant. In addition to Martell's identification, there were multiple eyewitness accounts of the shooting from other witnesses, leading the police to focus on the defendant as the prime suspect in the victim's murder. The police proceeded to work throughout the night in an attempt to solve the shooting and to locate the defendant.

The morning after the shooting, the police received information from Romero that the defendant had shot the victim and currently was "hiding out" in the second floor apartment at 7 Cossett Street. In light of this information, Sergeants Gary Pelosi and Eugene Coyle and several other members of the Waterbury police department arrived at the apartment, which belonged to Madelyn Quintana. Pelosi knocked and found the front door to the apartment ajar. A female came to the door, at which point Pelosi identified himself as a police officer, informed her that he was looking for the defendant, and inquired as to whether the defendant was in the apartment. The female opened the door and invited Pelosi into the apartment, where the defendant was in fact staying as an overnight guest. Pelosi entered the apartment and could see the defendant through an open doorway in one of the apartment's bedrooms. Pelosi entered the bedroom, identified himself, and told the defendant that he wanted to talk to him about the shooting that had occurred the previous night. The defendant said "okay," got out of bed, and asked for pants and shoes, which he put on.

The trial court further found that upon being roused from bed by Pelosi, the defendant was not free to leave and that Pelosi thought he might be armed. Pelosi did not handcuff the defendant, but did search the immediate area, including under the bed, for the gun involved in the shooting. Pelosi did not locate the gun under the bed or within the immediate reach of the defendant, and did not search the rest of the apartment or bedroom for the weapon.

The police then took the defendant to the police department, where he was interviewed by Pelosi and Detective Scott Stevenson. Prior to the police interview, the defendant was advised of and waived his *Miranda* rights against self-incrimination. Ultimately, the defendant gave the police both an oral preliminary statement and a two page written statement.[5] The defendant told the police that he had discarded the gun in Hayden Park. He then accompanied the police to the park, where the defendant showed them the location of the gun, and they notified and waited for the forensic personnel of the police department to retrieve the weapon. The police and the defendant then returned to the police station to resume the interview and the taking of the defendant's written statement. During that process, the defendant informed the police that he had also discarded in the park the shirt he was wearing at the time of the shooting. The police returned to the park to retrieve the shirt and then once again returned to the police department to complete the defendant's written statement.

---

[5] In the statement, the defendant admitted to having shot the victim and having discarded in the park the gun and the shirt he had been wearing. He also admitted that the jeans and boots that he was wearing at the time of the statement were the same ones he had been wearing at the time of the shooting. Although the police secured a search warrant for the jeans and boots, the court addressed those items of clothing as part of its ruling on the defendant's motion to suppress.

In addition to these specific factual findings, the following uncontradicted evidence was introduced during the evidentiary hearing, which supports the trial court's ruling on the motion. Dawn Jenkins, who was Quintana's sister, was the defendant's girlfriend at the time of the shooting, and also lived in the apartment at 7 Cossett Street. It was in Jenkins' bedroom that Pelosi saw the defendant through the open doorway after having been invited into the apartment.[6] The defendant was a frequent overnight guest at the apartment, and routinely slept with Jenkins in her bedroom where he kept items such as clothes and other personal effects. In addition to the defendant and Jenkins, there were four other people in the apartment when the police entered, namely, Quintana, Anthony Tome, and two individuals, who were identified only as Quintana's uncle, and the uncle's girlfriend. The state did not establish which female invited the police into the apartment. The defendant, however, does not dispute the fact that the police initially were given consent to enter the premises. There was also uncontroverted evidence that, in addition to Pelosi, four other police officers went to the Cossett Street apartment the morning after the shooting. Upon arriving at 7 Cossett Street, officers were stationed in the back and on the side of the building, while Pelosi approached the front door. After obtaining consent to enter the apartment, Pelosi observed the defendant through an open doorway lying down on a bed in Jenkins' bedroom. Pelosi concluded that the defendant was either sleeping or pretending to sleep under some sheets and blankets.

During the hearing on the defendant's motion to suppress, there was also uncontroverted testimony from

---

[6] There was conflicting evidence regarding whether Jenkins was in bed with the defendant when the police entered the bedroom. The court specifically credited Pelosi's testimony that the defendant was alone in the bed and that Pelosi could see him through the open door.

Lieutenant Neil O'Leary, who was the supervisor in charge of the homicide investigation, that the safety of the community is a particular concern when there is a person suspected of murder who has not been apprehended and when the murder weapon has not been recovered. Regarding the decision of whether to get an arrest warrant before apprehending the defendant, O'Leary also testified that, having learned of the defendant's possible whereabouts, "if we were to stop and get a warrant, [the defendant] could be halfway to Florida. We had information, we had [witnesses'] identifications that he was the shooter. Then they tell me they have an address on Cossett Street they believe that he's at. It's never our intention to stop and get a warrant. It's our intention to make things safe. By that I mean we go to the location, secure the suspect if he's there, and then we take it one step at a time. In every incident it's different. Every murder case is different. In this particular case obviously we wanted to get the suspect and get him in custody [to] at least see if he would be willing to cooperate with the investigation . . . to secure him so that he wouldn't flee, that evidence wouldn't be destroyed, and that we wouldn't have to worry about anyone else coming across harm's way."

It is useful to begin our analysis by reiterating that the defendant does not challenge the trial court's finding that the police entered the apartment with consent, and therefore does not contest that the police were legitimately in the apartment. The narrow question, therefore, is whether the police entry into the bedroom and ensuing seizure of the defendant were justified by exigent circumstances. We conclude that they were.[7]

---

[7] This conclusion renders it unnecessary to consider the state's arguments that: (1) the court improperly found that the entry into the bedroom was nonconsensual; (2) the defendant was not seized in the bedroom; and (3) even if the seizure was unlawful, the attenuation doctrine justified the introduction of the challenged evidence.

We first note the established scope of review on the application of the exigent circumstances doctrine. The trial court's finding of facts will stand unless they are clearly erroneous. Its legal conclusion regarding the applicability of the doctrine, however, is subject to de novo review. *State* v. *Blades*, 225 Conn. 609, 617, 626 A.2d 273 (1993). The burden is on the state to establish the facts that justify the application of the exigent circumstances doctrine. See *State* v. *Holmes*, 51 Conn. App. 217, 220, 721 A.2d 1195 (1998) ("[b]ecause a warrantless search is presumptively invalid, the state has the burden of affirmatively demonstrating a recognized exception to the warrant requirement"), cert. denied, 248 Conn. 904, 731 A.2d 309 (1999); see also *State* v. *Badgett*, 200 Conn. 412, 423–24, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

It is axiomatic that the police may not enter the home without a warrant or consent, unless one of the established exceptions to the warrant requirement is met. Indeed, "[p]hysical entry of the home is the chief evil against which the wording of the fourth amendment is directed."[8] *State* v. *Guertin*, 190 Conn. 440, 447, 461 A.2d 963 (1983); *Payton* v. *New York*, 445 U.S. 573, 585,

---

[8] Similarly, we have previously recognized that an overnight guest, such as the defendant, is entitled to a similar expectation of privacy and security from search and seizures in the absence of either consent or the presence of exigent circumstances. See *State* v. *Brosnan*, 221 Conn. 788, 807–808, 608 A.2d 49 (1992) ("In *Minnesota* v. *Olson*, 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 [1990], the United States Supreme Court concluded that an overnight guest in another's home has a legitimate expectation of privacy under the fourth amendment, and elaborated on the nature of that expectation. To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. . . . Several aspects of this expectation of privacy lead us to conclude that an overnight guest's expectation of privacy in the bedroom he occupies should be regarded as affording him the functional equivalent of the householder's common law privilege to resist an unlawful police entry." [Citations omitted; internal quotation marks omitted.]).

100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). In particular, "[a] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (Internal quotation marks omitted.) *State* v. *Blades,* supra, 225 Conn. 617; *State* v. *Magnano,* 204 Conn. 259, 265, 528 A.2d 760 (1987). Searches conducted pursuant to the emergency or exigent circumstances doctrine are one of the recognized exceptions to the warrant requirement under both the federal and state constitutions. *State* v. *Geisler,* 222 Conn. 672, 691, 610 A.2d 1225 (1992).

"The term, exigent circumstances, does not lend itself to a precise definition but generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization." (Internal quotation marks omitted.) *State* v. *Gant,* 231 Conn. 43, 63–64, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). It is well established in Connecticut, however, that the test for the application of the doctrine is objective, not subjective, and looks to the totality of the circumstances. See *State* v. *Guertin,* supra, 190 Conn. 453. Specifically, "[t]he test of exigent circumstances for the making of an arrest for a felony without a warrant . . . is whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test; its preeminent criterion is what a reasonable, well-trained police officer would believe, not what the arresting officer actually did believe." (Internal quotation marks omitted.) Id. "The reason-

ableness of a police officer's determination that an emergency exists is evaluated on the basis of facts known at the time of entry." (Internal quotation marks omitted.) *State* v. *Blades*, supra, 225 Conn. 619..

We also note "that the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property, and could lose valuable time especially during the initial phase of a criminal investigation. . . . Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . . Police often operate in the gray area between their community caretaking function and their function as criminal investigators. Often there is no bright line separating the one from the other; the emergency doctrine relies on an objective test wherein the reasonableness of the officer's belief is assessed on a case-by-case basis." (Citations omitted; internal quotation marks omitted.) Id. The three general categories that the courts have identified as justifying the application of the doctrine are danger to human life, destruction of evidence and flight of a suspect.[9] *State* v. *Guertin*, supra, 190 Conn. 448.

---

[9] When ruling on the defendant's motion to suppress, the trial court concluded that it was objectively reasonable for the police to conclude that all three categories warranting application of the exigent circumstances doctrine—danger to human life, destruction of evidence and flight of a suspect—had been met. We note that it is not necessary for all three categories to be met in order to warrant the application of the doctrine. To the contrary, evidence supporting any one of the identified categories may be sufficient for a court to conclude that a warrantless entry was objectively reasonable, and therefore, not improper. Consequently, it is unnecessary for us to evaluate whether the trial court correctly concluded that all three of

Application of these principles leads us to conclude that the entry of the police into the bedroom occupied by the defendant was justified by exigent circumstances because a reasonable police officer would have believed that an emergency existed involving danger to human life. First, as we have noted, the police were in the apartment itself by consent. Thus, they were already legitimately on the premises and could see the defendant lying on a bed through an open doorway. Accordingly, whether Pelosi's entry into the bedroom where the defendant was staying was lawful must be viewed through the prism of whether, once in the apartment by consent, a reasonable police officer would have believed that a further entry, namely, into the bedroom, was justified under the emergency doctrine. Additionally, the police had probable cause to believe that the defendant had very recently shot and killed one person, and the murder weapon had not been recovered. Consequently, we conclude that a reasonable police officer would have believed that the defendant may have had possession of the gun and, therefore, that he posed a continuing threat to human life and public safety, including their own, as well as the other individuals in the apartment. In particular, multiple eyewitness accounts reported that the defendant already had used the gun with deadly results approximately twelve hours earlier. On the basis of these facts, a reasonable police officer would have believed that, if given the opportunity, the defendant was likely to use the gun again.

Moreover, we are also mindful of the fact that there were four other people in the apartment, that the door to the defendant's bedroom was open, and that the defendant was visible to the police once they lawfully had obtained consent to enter the premises. Therefore, although the defendant appeared to be sleeping, it was

the identified categories warranting application of the exigent circumstances doctrine had been satisfied.

not unreasonable for Pelosi and the other officers to conclude that he might not have been, or that he could awaken at any moment in full view of the police. In that event, Pelosi and the other officers entering the apartment would have been as apparent to the defendant as he was to them. Thus, we conclude that on the basis of the particular facts of this case, a reasonable police officer would have believed that it was necessary to cross through the open doorway and enter the bedroom where the defendant was staying in order to neutralize any danger to himself, as well as potentially to the other individuals in the apartment. In sum, a reasonable police officer, having gained legitimate entry to the apartment from where he saw the defendant through an open doorway, reasonably would have believed that it was necessary to enter the bedroom to determine whether the defendant, who within the past twelve hours had shot and killed one person with a gun that had not yet been recovered, was still armed and, therefore, posed a continuing danger to human life and public safety.

This conclusion is consistent, not only with our precedents under the exigent circumstances doctrine; see, e.g., *State* v. *Gant*, supra, 231 Conn. 68 (warrantless search deemed valid when area from which defendant might have gained possession of gun immediately could have caused harm to police and others within apartment); *State* v. *Blades*, supra, 225 Conn. 621–22 (noting that emergency exception arises from community caretaking function, and that warrantless entry was justified when police had objectively reasonable belief that entry into defendant's apartment was necessary to locate victim and to protect or preserve life); *State* v. *Guertin*, supra, 190 Conn. 453 (warrantless search and seizure proper when under totality of circumstances police had reasonable grounds to believe that assailant had committed violent crime, may have been armed, and that

if immediate arrest were not made, accused would have been able to flee or avoid capture); but also with our precedents under the protective sweep doctrine. See, e.g., *State* v. *Mann*, 271 Conn. 300, 313, 857 A.2d 329 (2004) (when immediate safety of law enforcement officers in jeopardy, objective reasonableness of protective search determined by balancing need to conduct search against nature of intrusion), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005); see also *United States* v. *Miller*, 430 F.3d 93, 98 (2d Cir. 2005) (law enforcement officer lawfully present in particular area of home may conduct protective sweep upon reasonable suspicion that individual present in other area poses threat). When, as in the present case, the warrantless entry is justified by a reasonable belief that the defendant may be armed and dangerous and capable of providing an ongoing threat to public safety, both doctrines rest on the need to maintain the safety of law enforcement officials and the public in general.

Having entered the bedroom legitimately, the police were justified in seizing the defendant without stopping at that point to secure a warrant. In this regard, it is important to note that the lawful entry into the bedroom already legitimately had compromised the defendant's privacy interest in that room. Thus, the chief evil against which the warrant requirement is aimed, namely, the intrusion into the privacy of the home; see *State* v. *Guertin*, supra, 190 Conn. 447; already legitimately had been breached. Contrary to the suggestion of the defendant, the police were not then required either to remain with the defendant in the bedroom or retreat from that room into the rest of the apartment while additional police officers applied for an arrest warrant. This is particularly true, given that there were still four other people in the apartment, whose identities and relationships to the defendant were unknown to the police. In short, the police were not required to take the risk that

any one of those persons would seek to come to the defendant's aid in some unknown fashion. It was eminently reasonable, therefore, for the police to remove the defendant from the apartment, rather than to leave him there and secure the premises while one or more of them applied for a warrant. As we previously have noted in the context of similar cases, "[t]he standard regulating warrantless searches pursuant to the emergency doctrine is reasonableness"; *State* v. *Blades*, supra, 225 Conn. 622; and "while we respect the constitutional rights against unreasonable search and seizure of the citizenry, [c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." (Internal quotation marks omitted.) *State* v. *Gant*, supra, 231 Conn. 68. Similarly, in *State* v. *Januszewski*, 182 Conn. 142, 152, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), we observed that resort to the judicial process will not be required of law enforcement officers "where exigent circumstances exist that make the procurement of a search warrant unreasonable in light of the dangers involved . . . ." (Citations omitted.)

The defendant argues that the state failed to meet its burden of demonstrating that there were exigent circumstances justifying the warrantless entry by the police into the bedroom where the defendant was staying as an overnight guest. First, the defendant contends that the state failed to offer specific, nongeneralized justifications for the warrantless entry into the bedroom of the apartment. In this regard, the defendant notes that vague generalities will not suffice to meet the state's heavy burden. "[T]he government bears the burden of showing the existence of exigent circumstances by particularized evidence. . . . This is a heavy burden and can be satisfied only by demonstrating specific and articulable facts to justify the finding of exigent

circumstances." (Citation omitted; internal quotation marks omitted.) *United States* v. *Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000). We are not persuaded. The defendant's argument overlooks the reasonably objective concern of the police that the defendant was still armed with a gun, thus placing the public safety at a continuing risk, which we have discussed in detail previously in this opinion.

The defendant also argues that the state must demonstrate not only that an emergency existed, but that a warrant could not have been obtained at some earlier point in time. See *State* v. *Gant*, supra, 231 Conn. 68 ("[w]hen there are reasonable alternatives to a warrantless search, the state has not satisfied its burden of proving exigent circumstances" [internal quotation marks omitted]). In support of this argument, the defendant cites to federal precedent noting that the existence of adequate time to obtain a warrant is a critical factor in the determination of whether exigent circumstances existed to justify a warrantless entry. See, e.g., *United States* v. *Glover*, 555 F. Sup. 604, 612 (D.D.C. 1982) (no exigent circumstances where sufficient manpower for police to have staked out residence and to have obtained warrant), aff'd, 725 F.2d 120 (D.C. Cir. 1984). Similarly, the defendant contends that the slight delay associated with the warrant procedure would not have jeopardized the safety of the public or officer safety, or the integrity of the police investigation, because the defendant had had ample opportunity to do any damage that he intended by that point, and, at the time of his arrest, he was quietly sleeping in the bedroom he shared with Jenkins. We are not persuaded.

These arguments mischaracterize the narrow question that is before us. As explained previously, only

after entering the apartment lawfully[10] did Pelosi experience the additional exigency of seeing the defendant, whom he reasonably perceived as still being armed, through the open doorway of a bedroom. This fact distinguishes the present case from the argument and cases relied upon by the defendant.[11] Specifically, the facts of the cases cited by the defendant do not involve situations wherein the police were already lawfully on the premises and reasonably could believe their safety, as well as the safety of the general public, were in danger. Rather, the cases cited by the defendant involve situations where the police attempted to rely on the doctrine of exigent circumstances to gain entry to the premises as a whole, often after waiting for a significant period of time before approaching the premises, or offering only very general evidence in support of the claimed exigency.

In particular, the defendant calls our attention to the similarities between the present case and *United States*

---

[10] We recognize that Pelosi could not identify the woman who provided him with consent to enter the apartment, and that the state did not introduce evidence to establish the identity of the individual; the defendant, however, does not challenge the fact that Pelosi was lawfully in the apartment or contend that the woman who came to the door lacked the authority to grant him entry.

[11] The defendant cites the following cases, among others, in support of his argument: *United States* v. *Saari*, 272 F.3d 804, 810 (6th Cir. 2001) (warrantless entry unnecessary because no proof that anyone was being threatened inside and unsubstantiated information about explosives was too vague to constitute immediate threat to safety of police officers and public); *United States* v. *George*, 883 F.2d 1407, 1413 (9th Cir. 1989) (no exigency when suspects are inside their homes and unaware of their impending arrests because generally they have no reason immediately to flee or to destroy fruits of their crime); *United States* v. *Glover*, supra, 555 F. Sup. 612 (no exigent circumstances where sufficient manpower for police to have staked out residence and to have obtained warrant); *State* v. *Mullins*, 355 S.E.2d 24, 27 (W. Va. 1987) (exigent circumstances for home entry not present because police aware of defendant as suspect for long period of time and had opportunity to obtain warrant while conducting surveillance at his home).

v. *Adams*, 621 F.2d 41, 45 (1st Cir. 1980), wherein the court concluded that there were no exigent circumstances justifying a warrantless search and seizure. In *Adams*, the police sought to arrest an escaped convict at the home of a third party. Id., 43. The police knocked on the door of the home and were confronted by the defendant, who did not consent to the police entering the premises, and was immediately placed in handcuffs. Id., 44. The police then proceeded to search the remainder of the home without obtaining a search warrant. Id. The court concluded that "[t]here was no reason why either an arrest or search warrant could not have been obtained," prior to the police knocking on the defendant's door. Id. In particular, the court stated: "Like the [D]istrict [C]ourt, we are incredulous at the magistrate's finding that the [police] might reasonably have assumed that a magistrate or judge would not be available at 8:30 a.m. But even assuming the reasonableness of such an assumption, there was no reason why the apartment could not have been staked out [until] 9:50 [a.m.] while the warrant was obtained. There were only two doors to the apartment to watch, hardly beyond the capacity of seven law enforcement officers." Id., 45.

The defendant contends that the same reasoning that guided the decision of the Court of Appeals in *Adams* applies to the facts of the present case, namely, that the police arrived at 7 Cossett Street at approximately 8 a.m., that they had sufficient personnel to observe all of the premise's entrances and exits, and that they easily could have obtained a warrant from a judge when court opened at 9 a.m. We disagree. As noted previously, Pelosi and his fellow officers were not merely waiting outside of the apartment at 8 a.m., but were in the process of lawfully entering the premises by obtaining the consent of one of the occupants. Upon seeing the defendant through the open doorway, and having rea-

son to believe that he may still have been armed, it would have been unreasonable to expect the police to then retreat from the premises, or to post a sentry at the door to the bedroom in order to obtain a warrant. In short, Pelosi was not in a position of safety, and did not have the same luxury of time that the officers in *Adams* did when confronted with the claimed exigency justifying a warrantless search and seizure. On the basis of the facts of this case, therefore, rather than take the time necessary to carry out a warrant procedure, Pelosi reasonably concluded that immediate action was required to prevent the defendant from causing further danger to the life of police officers, as well as the members of the general public already in the apartment.

The defendant's repeated assertion that there was sufficient time for the police to stake out the Cossett Street apartment and obtain a warrant before entering the premises implies that Pelosi's consensual entry was somehow tainted by the fact that police may already have had sufficient evidence to go to a judge and obtain a warrant. Although not argued in his brief, at oral argument before this court the defendant also suggested that the police had created the exigency used to justify their warrantless search and seizure by entering the apartment in the first place.[12] In this respect, the defen-

---

[12] We are aware that the police cannot deliberately create an exigent circumstance in order to subvert the warrant requirements of the fourth amendment. Specifically, "if the facts demonstrate that officers deliberately sought to provoke a dangerous encounter in order to circumvent the warrant requirement, the resulting search will be deemed per se unreasonable." *State* v. *Mann*, supra, 271 Conn. 320, citing *United States* v. *Cantu*, 230 F.3d 148, 158 (5th Cir. 2000) (government cannot rely on exigency created by officers to justify warrantless search); *United States* v. *Curzi*, 867 F.2d 36, 43 n.6 (1st Cir. 1989) (police may not manipulate events to create exigency justifying warrantless entry). In *State* v. *Guertin*, supra, 190 Conn. 452, however, we noted that "[a] planned arrest is not the fraternal twin of a police created emergency." Additionally, when identifying a police created emergency, other courts have looked to "the reasonableness and propriety of the investigative tactics" that generated the exigent circumstances. (Internal quotation marks omitted.) *United States* v. *Rico*, 51 F.3d 495, 502 (5th Cir. 1995). We conclude that there is nothing in the record to indicate that Pelosi's actions

dant further implies that if the police could have obtained a warrant, they were required to do so, even when they were subsequently able to gain consensual entry to the premises. We disagree.

On the basis of the facts of this case, we conclude that even if we were to assume that the police could have obtained an arrest and search warrant for the defendant prior to Pelosi entering the premises, this fact does not mean that their failure to do so necessarily invalidates the warrantless conduct that followed. We reach this conclusion because, by obtaining consent to enter the apartment, Pelosi was already lawfully in a position to observe the exigent circumstances that justified his further actions. Additionally, as we previously have noted within the context of a warrantless search and seizure of a vehicle, "[w]e know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment. Exigent circumstances with regard to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of arrest. . . . The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action." (Internal quotation marks omitted.) *State* v. *Kolinsky*, 182 Conn. 533, 541, 438 A.2d 762

were improper or unreasonable. Indeed, as previously discussed, obtaining valid consent to enter a dwelling is a perfectly lawful and well established substitute for the warrant requirement. See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Additionally, Pelosi's knocking on the half open door of an apartment and being invited inside is a far cry from the deliberate conduct other courts have indicated may amount to the creation of, rather than reliance on, exigent circumstances. See *United States* v. *Hultgren*, 713 F.2d 79, 88 (5th Cir. 1983) (faking transmitter failure); *United States* v. *Thompson*, 700 F.2d 944, 951 (5th Cir. 1983) (undercover agent confronting suspect knowing that suspect will recognize him).

(1980), cert. denied, 451 U.S. 973, 101 S. Ct. 2054, 68 L. Ed. 2d 354 (1981), quoting *Cardwell* v. *Lewis*, 417 U.S. 583, 595–96, 94 S. Ct. 2464, 41 L. Ed. 2d 325 (1974).

This reasoning also has been applied by several federal courts within the context of warrantless search and seizures of a home or other dwelling. "It is, of course, axiomatic that agents are not required to obtain a search warrant as soon as it is practicable to do so." *United States* v. *Webster*, 750 F.2d 307, 327 (5th Cir. 1984); id. (delay in obtaining warrant, despite existence of probable cause, did not nullify validity of warrantless search of home based on exigent circumstances); see also *United States* v. *Miles*, 889 F.2d 382, 383 (2d Cir. 1989) ("even if the agents might have been able to obtain a warrant earlier in the day [to enter the home], their failure to do so at the first opportunity does not bar them from acting on an exigency that arises later" [internal quotation marks omitted]), quoting *United States* v. *Cattouse*, 846 F.2d 144, 147 (2d Cir. 1988); *United States* v. *Hultgren*, 713 F.2d 79, 88 (5th Cir. 1983) (warrantless entry into home justified based on exigent circumstances despite prior opportunity to obtain warrant); *United States* v. *Thompson*, 700 F.2d 944, 950 (5th Cir. 1983) (police failure to avail themselves of opportunity to obtain warrant to enter home does not end inquiry of whether exigent circumstances justified warrantless entry because failure to obtain warrant at first opportunity is not fatal defect); *United States* v. *Gardner*, 553 F.2d 946, 948 (5th Cir. 1977) (reasonableness of search in home under exigent circumstances not foreclosed by failure to obtain warrant at earliest practicable moment), cert. denied, 434 U.S. 1011, 98 S. Ct. 722, 54 L. Ed. 2d 753 (1978). In light of this precedent, we conclude that, despite the presence of probable cause, the police were not under a separate obligation to obtain a warrant before trying to obtain consent to enter the apartment at 7 Cossett Street. As previously noted, con-

sent serves as a valid substitute for the warrant and probable cause protections afforded by the fourth amendment. See *State* v. *Ruth*, 181 Conn. 187, 193, 435 A.2d 3 (1980). Therefore, once lawfully on the premises, Pelosi was also justified in entering the bedroom and responding to the exigent circumstances that he encountered.

Finally, the defendant argues that the "exigent circumstances" offered by the state at trial were not reasons for the warrantless search and seizure by the police, but rather excuses for that invasion. Furthermore, the defendant contends that Pelosi's investigative tactics in this case are indicative of a standard policy within the Waterbury police department of entering private homes without a warrant to make serious felony arrests. In particular, the defendant argues that the police did not have a fear of exigent circumstances when they learned of the defendant's whereabouts the morning following the shooting. Rather, the police simply went to the Cossett Street apartment and arrested the defendant. This argument is without merit.

First, the defendant's argument that the police were not cognizant of exigent circumstances when deciding to approach the apartment where the defendant was staying once again misconstrues the relevant analysis. As the trial court noted in its ruling on the motion to suppress, Pelosi obtained consent initially to enter the apartment and relied on the presence of exigent circumstances only to justify the further step of crossing through the open doorway of the bedroom to detain the defendant. It is irrelevant, therefore, whether exigent circumstances, or simply the identification of the defendant by bystanders of the shooting, brought the police knocking on the door of the apartment at 7 Cossett Street because the exigency justifying Pelosi's warrantless search and seizure was not experienced until

well after the police learned of the defendant's where-
abouts.

Additionally, we conclude that the evidence falls far
short of demonstrating that the police in Waterbury
have a systematic policy of violating defendants' fourth
amendment rights, or that, upon being dispatched to
Cossett Street, police were not concerned about locat-
ing the missing gun and preserving public safety. To
the contrary, during the hearing on the defendant's
motion to suppress, Pelosi, Coyle, and O'Leary testified
regarding their concern over the fact that the defendant
had been identified as shooting the victim, and that the
gun used by the defendant was unaccounted for, thus
potentially placing the public in further danger. O'Leary
elaborated on this concern within the context of the
decision of whether to get an arrest warrant before
apprehending the defendant. Specifically, he noted that
the Waterbury police department handles every murder
investigation differently based on the facts of the partic-
ular case.[13] Therefore, in the absence of a credible show-
ing that Pelosi's and the other officers' concern for
public safety was only pretextual, a conclusion that we
note is in direct contrast to the findings of the trial court
when ruling on the defendant's motion to suppress, we
must rely on the objective test of whether, once legally
in the apartment and upon seeing the defendant through

---

[13] Upon learning about the defendant's possible whereabouts, O'Leary
testified as follows: "[I]f we were to stop and get a warrant, [the defendant]
could be halfway to Florida. We had information, we had [witnesses'] identifi-
cations that he was the shooter. Then they tell me they have an address on
Cossett Street they believe that he's at. It's never our intention to stop and
get a warrant. It's our intention to make things safe. By that I mean we go
to the location, secure the suspect if he's there, and then we take it one step
at a time. *In every incident it's different. Every murder case is different. In
this particular case obviously we wanted to get the suspect and get him
in custody* [to] at least see if he would be willing to cooperate with the
investigation . . . *to secure him so that he wouldn't flee,* that evidence
wouldn't be destroyed, *and that we wouldn't have to worry about anyone
else coming across harm's way.*" (Emphasis added.)

an open doorway, a reasonable police officer would believe that the defendant posed a danger to human life. On the basis of the foregoing analysis and the facts of this case, we conclude that this test has been satisfied.

## II

## JURY INSTRUCTION ON EXTREME EMOTIONAL DISTURBANCE

The defendant next claims that the trial court improperly instructed the jury regarding his affirmative defense of extreme emotional disturbance. Specifically, the defendant contends that the trial court's jury charge was deficient in three respects: (1) it did not advise the jury that extreme emotional disturbance could be caused by pain; (2) it did not advise the jury that extreme emotional disturbance need not be spontaneous and could develop over time; and (3) it did not adequately advise the jury as to the applicable burden of proof.[14] In connection with the trial court's instruction on the applicable burden of proof, the defendant also argues that the trial court improperly instructed the jury that the state was not required to produce expert testimony to refute the defendant's claim of extreme emotional disturbance. We disagree.

The following additional facts are relevant to our analysis of this claim. At trial, the defendant took the stand and admitted shooting the victim; however, he

[14] The defendant properly preserved his right to appeal on this issue. At trial he submitted an appropriate request to charge on extreme emotional disturbance. See footnote 17 of this opinion. Additionally, following the completion of the trial court's jury instruction, the defendant took exceptions to the trial court's failure to mention pain as part of the charge on extreme emotional disturbance, for failing to mention that the disturbance can simmer over time, and for mentioning that the state need not present experts to refute the defendant's defense. Furthermore, the defendant took an exception to the trial court's failure to state explicitly that proof by a preponderance of the evidence is a lower burden than proof beyond a reasonable doubt.

asserted an affirmative defense that he committed the shooting under the influence of an extreme emotional disturbance.[15] In support of this defense, the defendant offered affirmative evidence, including his own testimony and that of other witnesses, that he was intoxicated and enraged at the time he shot the victim. Specifically, the defendant testified that he had smoked "dust" on the night before the shooting and had smoked it again shortly before meeting with the victim regarding the disputed drug sale. Several witnesses supported the defendant's testimony about his drug altered state at the time of the shooting. In particular, Jesse Brown testified that at the time of the shooting the defendant was "bugging out, like tripping. He was like talking to himself, and he was just talking and mumbling." Jenkins also testified that the defendant was high after the shooting and that he stated that he could not believe that he had shot the victim. Furthermore, before the defendant retrieved the gun and shot the victim, the

---

[15] Extreme emotional disturbance is an affirmative defense to murder and is codified in § 53a-54a (a), which provides in relevant part that "it shall be an affirmative defense [to murder] that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." We have previously offered guidance on the application of the defense in State v. Zdanis, 182 Conn. 388, 390–91, 438 A.2d 696 (1980) ("In determining whether the defendant has established the affirmative defense of an extreme emotional disturbance by a fair preponderance of the evidence as a mitigation of murder to manslaughter, the trier of fact must find that: [a] the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; [b] the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and [c] the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions. Consideration is given to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational thinking for that individual no longer prevailed at the time of the act."), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 607 (1981).

defendant and the victim were in a physical altercation. During the course of the fight, the defendant was repeatedly hit in the face and thrown to the ground, at which point his hands were stepped on by several of the individuals who came to his aid by restraining and assaulting the victim. The defendant also testified that at the time of the actual shooting he was in a rage due to the fact he had been beaten and injured by the victim during their altercation. In his closing argument, defense counsel drew upon these statements and argued that the alleged assault by the victim upon the defendant gave rise to an extreme emotional disturbance. Specifically, defense counsel noted: "[The defendant] tries to get up . . . [a]nd they're stepping on his hands, and that's causing him more pain, and he goes into a rage. . . . And another man, bigger, stronger, comes up in an unprovoked attack and punches him in the face and knocks him down. Now, is it reasonable for that to make somebody have an extreme emotional disturbance?"

The framework used to evaluate a challenge to a jury instruction given by the trial court is well established. "Our review of the defendant's claim requires that we examine the court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 368, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003), quoting *State* v. *Ortiz*, 217 Conn. 648, 661–62,

588 A.2d 127 (1991). "As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Faria*, 254 Conn. 613, 634, 758 A.2d 348 (2000). Additionally, we have noted that "[a]n error in instructions in a criminal case is reversible error when it is shown that it is reasonably possible for errors of constitutional dimension or reasonably probable for nonconstitutional errors that the jury were misled." *State* v. *Mason*, 186 Conn. 574, 585–86, 442 A.2d 1335 (1982). Furthermore, we have stated that jury instructions regarding the defense of extreme emotional disturbance are not of constitutional magnitude. See *State* v. *Austin*, 244 Conn. 226, 244, 710 A.2d 732 (1998).

The application of the previously mentioned framework necessarily requires us to compare the jury instruction given by the trial court,[16] with the charge

[16] The following is the pertinent section of the jury instruction given by the trial court regarding the defense of extreme emotional disturbance: "To determine whether the defendant has established the affirmative defense of extreme emotional disturbance by a preponderance of the evidence as a mitigation of murder to manslaughter in the first degree with a firearm, you must find: One, that the defendant was exposed to extremely unusual and overwhelming stress; and two, that the defendant had an extreme emotional reaction to it as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions. Consideration is given to whether the intensity of these feelings was such that the defendant's usual intellectual controls failed and the normal rational thinking for that individual no longer prevailed at the time of the act.

"It is your responsibility as the triers of fact to decide to what extent, if any, the defendant's emotions governed his conduct at the time he intentionally caused the death of [the victim]. The word extreme refers to the greatest intensity away from the normal state of the defendant.

"If you find that the defendant acted under the influence of emotional disturbance and that it was extreme, you must then consider whether there is a reasonable explanation or excuse for such disturbance. You must measure the reasonableness from the viewpoint of a reasonable person in the defendant's situation under the circumstances as he believed them to be.

"I stated earlier that extreme emotional disturbance is an affirmative defense, and that the burden is on the defendant to prove it by a preponderance of the evidence.

requested by the defendant.[17] Upon making this compar-

"Proof by a preponderance of the evidence means considering all the evidence fairly and impartially, enough evidence as produces in your minds a reasonable belief that what is sought to be proven is more likely true than not true. This means that you take all of the evidence that has been offered on this issue by both the defendant and the state and weigh and balance it. You have heard the testimony of the defendant's witnesses on this issue of extreme emotional disturbance. There is no requirement that the state present expert testimony on this subject. You, the fact finder, are free to believe or disbelieve any witness' testimony. You are referred to my previous instructions on credibility which apply here as well.

"If after weighing the evidence, the better and weightier evidence inclines in the defendant's favor, then he has sustained his burden of proving his affirmative defense of extreme emotional disturbance by a preponderance of the evidence and you must find him not guilty of murder. Furthermore, if you also find that the state has proven beyond a reasonable doubt that the defendant intended to cause the death of [the victim] and that he did cause the death of [the victim] with a firearm, the elements of murder, but under circumstances that do not constitute murder because he was acting under the influence of extreme emotional disturbance, you must find the defendant guilty of manslaughter in the first degree with a firearm. If, however, you find that the defendant has not sustained his burden of proving this defense by a preponderance of the evidence, then you will reject this defense and determine whether the state has proven the elements of the charge of murder beyond a reasonable doubt."

[17] The defendant's request to charge on the defense of extreme emotional disturbance included the following relevant language: "You have heard evidence that the defendant was assaulted by [the victim] and that this caused him pain and made him angry to the point where he lost control and shot [the victim]. This evidence raises the defense of extreme emotional disturbance. If you find that the prosecution has proven all the elements of murder, you must, nevertheless, go on to decide whether the defendant was experiencing an extreme emotional disturbance when he caused the death of [the victim]. Only consider extreme emotion[al] disturbance if the prosecution has proven all the elements of murder. If the prosecution has not proven all the elements of murder then the defendant is not guilty of murder and you need not consider the defense of extreme emotional disturbance. . . .

"Because this defense is an affirmative defense it is the defendant's burden to prove it. The prosecution does not have the burden of proving that the defendant is not entitled to the affirmative defense of extreme emotional disturbance; the defendant has the burden of proving he is. However, the defendant's burden of proof is lower than proof beyond a reasonable doubt, he has the burden of proving extreme emotional disturbance by a preponderance of the evidence. Proof by a preponderance of the evidence means more probable than not. If you think of the scales of justice, a preponderance of the evidence would be that amount of evidence necessary to tilt it ever

ison, we conclude that, although the trial court opted not to adopt the precise wording regarding pain as a possible cause of extreme emotional disturbance, as suggested by the defendant, the substance of the defendant's request to charge was given, and that, when read as a whole, it is not reasonably probable that the jury could have been misled by the trial court's instructions. In particular, we conclude that there was nothing that required the trial court to include the allegedly improper omission regarding pain identified by the defendant in

so slightly in the favor of the defendant. If you think it more likely than not that the defendant was experiencing an extreme emotional disturbance then the defendant has met his burden. If the evidence is even or it is less likely than not that the defendant was experiencing an extreme emotional disturbance then the defendant has not met his burden.

"I will now tell you what exactly the defendant must prove to establish extreme emotional disturbance. There are two elements: (1) The defendant was exposed to an extremely unusual and overwhelming state that is more than mere annoyance or unhappiness; and (2) The defendant had an extreme emotional reaction to that state, as a result of which he lost his self-control, and his reason was overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, pain, or other similar emotions. You should give consideration to whether the intensity of these feelings was such that the defendant's usual intellectual controls failed and that his normal rational thinking no longer prevailed at the time of the act. . . .

"There must be a reasonable excuse for the defendant to have an extreme emotional reaction, and the reasonableness must be determined from the viewpoint of a reasonable person in the defendant's situation under the circumstances as the defendant believed them to be. This does not mean that the defendant has to prove that it was reasonable for him to shoot [the victim]. The defendant must instead prove that it was reasonable for him to have experienced an extreme emotional reaction. When you decide whether he experienced an extreme emotional reaction you must consider it from his point of view, from the point of view of a person in his circumstances, as he believed them to be. Also, there is no requirement that the disturbance be sudden or spontaneous, it may simmer in the defendant's mind for a period of time.

"To sum up, if you find that the prosecution has proved murder beyond a reasonable doubt and that [the] defendant has not established the elements of extreme emotional disturbance, then your verdict would be guilty of murder. But, if you find that although the prosecution has proved murder beyond a reasonable doubt, the defendant has nevertheless proved extreme emotional disturbance by a preponderance of the evidence, then your verdict would be guilty of manslaughter in the first degree."

the court's instructions to the jury, and that there was nothing in the trial court's charge to preclude the jury from considering the omitted instructions during its deliberations. With respect to the court's omission of an instruction that an extreme emotional disturbance may develop over time, we conclude that, although the trial court should have given the instruction, it is not reasonably probable that the jury was misled by the omission.

First, with respect to the defendant's argument that pain should have been identified as a possible cause of extreme emotional disturbance, we note, as does the defendant, that no Connecticut case has held that pain can be the source of an extreme emotional disturbance. Additionally, the parties have not identified and we are not aware of any Connecticut case that mandates pain be included in the list of factors that can give rise to an extreme emotional disturbance. As set forth in footnote 16 of this opinion, the trial court provided a list that was merely illustrative of the potential causes of an extreme emotional disturbance, including "passion, anger, distress, grief, excessive agitation or other similar emotions." Indeed, we have specifically noted that these illustrative examples "are neither conclusive nor exclusive." *State* v. *Person*, 236 Conn. 342, 351, 673 A.2d 463 (1996); id. ("[i]n an effort to [interpret] the meaning of the phrase extreme emotional disturbance . . . [this court has] enumerated understandable guidelines for instructing a jury in determining the presence or absence of that mental condition . . . but they are neither conclusive nor exclusive" [citation omitted; internal quotation marks omitted]). In particular, the jury instruction given by the trial court also acknowledged that extreme emotional disturbance may result from "similar emotions" to those causes enumerated in its instructions, and it reminded the jury that the issue before them was whether "the defendant was exposed

to extremely unusual and overwhelming stress . . . that . . . as a result of which . . . reason was overborne by extreme intense feelings . . . ." We conclude that it is unreasonable to think that the jury could have been misled by this instruction into thinking that pain could not qualify as one of the "similar emotions" potentially warranting the application of the defense of extreme emotional disturbance.[18] In short, nothing in the trial court's instruction prevented the jury from factoring the defendant's claim of pain into its deliberations. Consequently, we agree with the state that the defendant's argument on this subject is without merit.

Second, with respect to the defendant's contention that the trial court should have instructed the jury that the extreme emotional disturbance could develop over time, we acknowledge that it is well established that an extreme emotional disturbance may develop over time. See *State* v. *Person,* supra, 236 Conn. 352 ("[a] homicide influenced by an extreme emotional disturbance . . . is not one which is necessarily committed in the hot blood state but rather can be one brought about by a significant mental trauma that caused the defendant to brood for a long period of time and then react violently, seemingly without provocation" [internal quotation marks omitted]). Similarly, we also acknowledge that, in *State* v. *Kaddah,* 250 Conn. 563, 580, 736 A.2d 902 (1999), the trial court provided a jury instruction similar to that requested by the defendant in the present case.[19] In neither of those cases, however,

___

[18] Additionally, although not required, we also note that "excessive agitation" was specifically identified in the trial court's jury instruction, an emotion that is nearly identical to the "rage" that the defendant testified he was experiencing when he shot the victim.

[19] Specifically, in *State* v. *Kaddah,* supra, 250 Conn. 580, the trial court instructed the jury in relevant part: "While the emotional disturbance need not necessarily have been a spontaneous or sudden occurrence or caused by any particular provoking event, indeed [it] may have simmered in the defendant's mind for [a] long period of time, the disturbance must actually have influenced his conduct at the time of the killing." (Internal quotation marks omitted.)

was this court required to decide the issue of whether the trial court's jury instruction must contain specific language regarding the fact that an emotional disturbance can develop over time. Rather, in *State* v. *Person,* supra, 351, the question was whether the jury should have received a charge on extreme emotional disturbance at all, and in *State* v. *Kaddah,* supra, 577, the issue was whether the trial court's jury charge should have noted that the victim need not be the cause of the perpetrator's distress.

The relevant question in the present case is whether the absence of a specific reference to the fact that an extreme emotional disturbance may develop over time made it reasonably probable that the jury could have been misled by the trial court's jury instruction. We conclude that, although the trial court should have given the requested instruction because it was an accurate statement of the applicable law, it was not reasonably probable that the trial court's omission in this area misled the jury. A review of the instruction as given illustrates that there was no suggestion by the trial court that an extreme emotional disturbance must be sudden or spontaneous. In particular, the trial court's jury charge emphasized that, "[i]t is your responsibility as the triers of fact to decide to what extent, if any, the defendant's emotions governed his conduct at the time he intentionally caused the death of [the victim]. The word extreme refers to the greatest intensity away from the normal state of the defendant." In short, the timing of the event causing the defendant's extreme emotions, as compared to the timing of when the defendant killed the victim, was never given any significance by the trial court one way or another. Additionally, we agree with the state that portions of the defendant's testimony at trial suggest that there was not a significant gap in time between his fight with the victim and the shooting. Specifically, the defendant testified that he went

directly from the fight following the contested drug sale to retrieve the gun from the abandoned house.[20] It is unreasonable, therefore, to infer that the jury was necessarily misled into believing that the extreme emotional disturbance in question must have occurred nearly simultaneous to the victim's shooting in order for it to have been a valid defense to murder.

Finally, the defendant argues that the trial court did not adequately advise the jury of the relevant burden of proof to a defense of extreme emotional disturbance.[21] Specifically, the defendant contends that the trial court's jury instruction should have differentiated for

[20] In response to questioning from defense counsel, the defendant testified in relevant part as follows:

"Q. And then when you say you bounced, you mean you left?

"A. Yeah, I left.

"Q. And when you left, was the fight [involving the victim] still going on?

"A. Yeah.

"Q. And where did you go?

"A. I went and got the gun. I went into an abandoned house."

[21] In conjunction with this argument, the defendant also objects to the trial court's reference that the state was not required to present expert testimony to refute the defendant's defense of extreme emotional disturbance. In fact, no expert testimony was introduced on this subject by either side at trial, a fact that we have previously determined does not necessarily prevent the application of the defense. See *State* v. *Person*, supra, 236 Conn. 351 n.14 ("Expert testimony is not required to establish the defense of extreme emotional disturbance. . . . The defendant's own testimony or the testimony of a lay witness may be offered to prove that the defendant was acting under extreme emotional disturbance." [Citation omitted.]). The defendant contends that the trial court's mere reference to the fact that the state was not required to present expert testimony to refute his arguments somehow created the impression that the defendant had an affirmative obligation to present an expert who could substantiate his claims. We agree with the state that this strained interpretation is not reasonable and that it lacks merit. The trial court instructed the jury to "take all the evidence that has been offered on this issue by both the defendant and the state and weigh and balance it. . . . You, the fact finder, are free to believe or disbelieve any witness' testimony." The trial court's instruction made it clear that the jury was entitled to credit the defendant's evidence if it wished, as it was presented at trial, without the benefit of verification by an expert. Accordingly, we conclude that when read as a whole, it is not reasonably probable that the jury could have been misled by the trial court's mention of expert testimony.

the jury that proof by a preponderance of the evidence was lower than proof beyond a reasonable doubt. At the outset, we reiterate that "[o]ur review of the defendant's claim requires that we examine the court's entire charge to determine whether it is reasonably [probable] that the jury could have been misled by the omission of the requested instruction." (Internal quotation marks omitted.) *State* v. *Dehaney*, supra, 261 Conn. 368. A review of the trial court's jury instruction as given reveals that the trial court repeatedly stated that the relevant burden of proof was by a preponderance of the evidence. Indeed, as noted in footnote 16 of this opinion, the trial court instructed the jury that "extreme emotional disturbance is an affirmative defense, and that the burden is on the defendant to prove it by a preponderance of the evidence. Proof by a preponderance of the evidence means considering all the evidence fairly and impartially, enough evidence as produces in your minds a reasonable belief that what is sought to be proven is more likely true than not true. . . . If after weighing the evidence, the better and weightier evidence inclines in the defendant's favor, then he has sustained his burden of proving his affirmative defense of extreme emotional disturbance by a preponderance of the evidence and you must find him not guilty of murder."[22]

---

[22] We note that the trial court's instruction to the jury on this subject is in marked contrast to the instruction given by the trial court in cases cited by the defendant wherein a reversal was deemed warranted. For example, in *State* v. *Schweitzer*, 57 Conn. 532, 538–39, 18 A. 787 (1889), the trial court charged the jury that the defendant must prove his affirmative defense of adultery beyond a reasonable doubt. This court subsequently concluded that the defendant only needed to prove his wife's misconduct by a preponderance of the evidence. Id., 541. A new trial was granted because the trial court overtly misstated the appropriate burden of proof. Id., 543. This problem is not present in the present case. Rather, the defendant merely claims that the trial court did not sufficiently differentiate between the two standards of proof when instructing the jury. Similarly, in *State* v. *Suggs*, 209 Conn. 733, 752, 553 A.2d 1110 (1989), the trial court failed to address the relevant burden of proof at all, and we concluded that the trial court should have instructed the jury "that the defendant bore the burden of

Furthermore, although not mentioned in conjunction with its instruction on the meaning of "proof by a preponderance of the evidence," the trial court also extensively advised the jury on the meaning of "proof beyond a reasonable doubt." Specifically, in its instruction to the jury, the trial court noted that: "The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that, after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors as reasonable men and women a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion." When contrasting this instruction with phrases used to describe preponderance of the evidence as, "what is sought to be proven is more likely true than not true," and "[if] the better and weightier evidence inclines in the defendant's favor, then he has sustained his burden," we conclude that the trial court adequately differentiated the two burdens of proof for the jury. In sum, when considering the trial court's instruction as a whole, it is not reasonably probable that the jury could have been misled into believing that "proof by a preponderance of the evidence" was a higher burden than "proof beyond a reasonable doubt."

The judgment is affirmed.

In this opinion the other justices concurred.

---

establishing the affirmative defense of cohabitation by a preponderance of the evidence."