******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

ECKER, J., dissenting. The first sentence of the majority opinion reveals the concern animating its legal analysis. Quoting an opinion written by a dissenting justice nearly thirty years ago, the majority expresses its desire to eschew a " 'per se rule that anyone who kills a former girlfriend or boyfriend is entitled to a jury instruction on extreme emotional disturbance.' " See *State* v. *Person*, 236 Conn. 342, 362 n.1, 673 A.2d 463 (1996) (*Callahan, J.*, dissenting). As a matter of public policy, I am in no position to say that this concern is unreasonable, although I trust our juries, properly instructed on the law, to ensure that only factually supported claims of extreme emotional disturbance will prevail at trial, and point out that the defense is one of mitigation, not justification; the most that a defendant can gain from it is a lengthy prison sentence for manslaughter. See General Statutes § 53a-54a (a); see also General Statutes §§ 53a-55 and 53a-35a (6). My fundamental concern is that we are not authorized to make public policy in this case. The only question properly before this court is whether, *viewing the evidence in the light most favorable to the defendant*, Carlton Henderson, any rational juror might credit his extreme emotional disturbance defense. If so, the decision to mitigate the crime to manslaughter is not for a judge to make.

Courts must be especially cautious to avoid judicial lawmaking in an area in which the legislature has spoken. I will be the first to acknowledge that such lawmaking, which some call policymaking, often is an appropriate judicial function. Judges are both empowered and obligated to develop legal rules and standards in contexts involving core judicial functions, including not only the promulgation of requirements governing legal procedures, but also in connection with various fields of substantive law—the prime examples being constitu-

tional law and common law.[1] But statutory law is different. Although what may be considered judicial lawmaking is sometimes necessary to fill in statutory gaps or to resolve ambiguities,[2] courts are not permitted to improve a statute by construction. See, e.g., *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 316 Conn. 790, 803–804, 114 A.3d 1181 (2015) ("[i]t is not the province of this court, under the guise of statutory interpretation, to legislate . . . a [particular] policy, even if we were to agree . . . that it is a better policy than the one endorsed by the legislature as reflected in its statutory language").

Whether we like it or not, we must accept the fact that the legislature chose to enact a penal statute expressly providing, in relevant part, that "it shall be an affirmative defense [to the crime of murder] that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be

---

[1] See, e.g., *State* v. *Purcell*, 331 Conn. 318, 362, 203 A.3d 542 (2019) (holding that policy considerations required more demanding prophylactic rule under state constitution to safeguard rights of accused to advice of counsel during custodial interrogation); *L. L.* v. *Newell Brands, Inc.*, 351 Conn. 262, 263–66, 330 A.3d 53 (2025) (declining on policy grounds to recognize common-law cause of action for loss of filial consortium).

[2] "We often must legislate interstitially to iron out inconsistencies within a statute or to fill gaps resulting from legislative oversight or to resolve ambiguities resulting from a legislative compromise." (Footnote omitted.) *U.S. Bulk Carriers, Inc.* v. *Arguelles*, 400 U.S. 351, 354, 91 S. Ct. 409, 27 L. Ed. 2d 456 (1971); see *Borelli* v. *Renaldi*, 336 Conn. 1, 72, 243 A.3d 1064 (2020) (*Ecker, J.*, dissenting) ("in an age of statutes, there remains a vital judicial role to fill, in case-by-case adjudication, the numerous gaps, interstices, and ambiguities that emerge as legislative designs meet the infinitely varied and unpredictable conditions of the real world"); see also B. Cardozo, The Nature of the Judicial Process (1921) pp. 15–17, 113–115, 129; E. Peters, "Common Law Judging in a Statutory World: An Address," 43 U. Pitt. L. Rev. 995, 1002–1005 (1982).

. . . ." General Statutes § 53a-54a (a). We recently reaffirmed that there are "two elements of [the affirmative defense of extreme emotional disturbance]: (1) the defendant committed the offense under the influence of extreme emotional disturbance; and (2) there was a reasonable explanation or excuse for the defendant's extreme emotional disturbance." (Internal quotation marks omitted.) *State* v. *Parris*, 352 Conn. 652, 668, 338 A.3d 1139 (2025). This standard "is objective in its overview, but subjective as to the defendant's belief." (Internal quotation marks omitted.) Id. The unique nature of this particular hybrid, subjective-objective amalgam no doubt presents its challenges, but, as we observed in *Parris*, the standard is straightforward enough to communicate to a jury. See id., 675–76 n.12. The statute further provides that the defendant bears the burden of establishing the elements of the defense by a preponderance of the evidence. Id., 669. If the jury finds that the defendant has met this burden, then the defendant cannot be found guilty of murder, but is guilty of manslaughter instead. See id., 665.

There are two important, supplemental legal principles that are used to determine whether a defendant is entitled to a jury instruction on the statutory defense of extreme emotional disturbance. Both are well settled. First, a defendant is entitled to the instruction "only if there is sufficient evidence for a rational juror to find that all the elements of the defense are established by a preponderance of the evidence." *State* v. *Person*, supra, 236 Conn. 353. Second, and of critical importance in the present case, a reviewing court is required to construe the facts in the light most favorable to providing the instruction. See, e.g., *State* v. *Belle*, 215 Conn. 257, 273, 576 A.2d 139 (1990), overruled on other grounds by *State* v. *Person*, 236 Conn. 342, 673 A.2d 463 (1996); *State* v. *Jusino*, 163 Conn. App. 618, 630, 137 A.3d 65, cert. denied, 321 Conn. 906, 136 A.3d 643

(2016). Whether a defendant is entitled to the instruction is a question of law, subject to plenary review. See, e.g., *State* v. *Honsch*, 349 Conn. 783, 817, 322 A.3d 1019 (2024); see also *State* v. *Person*, supra, 352.

I find it necessary to dwell briefly on the second of these points—the requirement that the court view the facts in the light most favorable to the defendant—because it serves to illuminate the flaw in the majority's legal analysis. This requirement implicates the constitutional right to a jury trial, which is not a trifle.[3] The jury right "is fundamental in our judicial system, and . . . includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded [people] passed [on] by the jury and not by the court." (Internal quotation marks omitted.) *Howard* v. *MacDonald*, 270 Conn. 111, 128, 851 A.2d 1142 (2004). It follows that judges may not take away factual issues from the jury as a means of implementing fact intensive policy choices that the legislature has chosen to submit to the jury. With regard to criminal cases, we recently explained that "[t]he jury trial provisions in the [f]ederal and [s]tate [c]onstitutions reflect a fundamental decision about the exercise of official

---

[3] The right to a trial by jury is enshrined in both the constitution of the United States and the Connecticut constitution. See U.S. Const., amend VI ("[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury"); U.S. Const., amend. VII ("[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law"); Conn. Const., art. I, § 8 ("the accused shall have a right . . . in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury"); Conn. Const., art. I, § 19 ("[t]he right of trial by jury shall remain inviolate"); see also *State* v. *Perrella*, 144 Conn. 228, 231, 129 A.2d 226 (1957) ("[t]he purpose and effect of [article first, §§ 8 and 19, of] the Connecticut constitution is to preserve and make available to litigants as a political right the institution of jury trial, in all its essential features as derived from our ancestors and now existing by force of our common law" (internal quotation marks omitted)).

power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." (Internal quotation marks omitted.) *State* v. *Langston*, 346 Conn. 605, 634, 294 A.3d 1002 (2023), cert. denied,     U.S.    , 144 S. Ct. 698, 217 L. Ed. 2d 391 (2024); see also *State* v. *LaBrec*, 270 Conn. 548, 556, 854 A.2d 1 (2004) ("the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence" (internal quotation marks omitted)). A request to charge on a theory of defense of the general nature involved in the present case must be assessed with these considerations in mind. See, e.g., *State* v. *Smith*, 262 Conn. 453, 470, 815 A.2d 1216 (2003) ("[T]he jury's role as [fact finder] is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a [theory of defense], if it is requested. . . . Otherwise, the defendant would lose the right to have the jury pass [on] every factual issue fairly presented by the evidence." (Internal quotation marks omitted.)).

In my view, the majority fails at the most important points to construe the evidence in the light most favorable to the defendant. This standard is well established. In assessing criminal appeals challenging the sufficiency of the evidence, we routinely review the record "in the light most favorable" to sustaining the verdict, which we have explained means affirming the findings of the trier of fact if they are "reasonably supported by the evidence and the logical inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Evans*, 203 Conn. 212, 238, 523 A.2d 1306 (1987). The "light most favorable" standard is also routinely used in a variety of contexts in civil cases, including the procedures

applicable to motions for summary judgment, in which the nonmoving party must be "given the benefit of all favorable inferences that can be drawn." *Evans Products Co.* v. *Clinton Building Supply, Inc.*, 174 Conn. 512, 516, 391 A.2d 157 (1978).[4] In reviewing whether the jury should have been instructed on a particular defense, the standard requires us to "adopt the version of the facts most favorable to the defendant [that] the evidence would reasonably support." (Internal quotation marks omitted.) *State* v. *Hargett*, 343 Conn. 604, 620, 275 A.3d 601 (2022); see also *Davis* v. *Strack*, 270 F.3d 111, 125 (2d Cir. 2001) ("light most favorable" analysis requires "drawing all reasonably permissible inferences in [the defendant's] favor"); *People* v. *McManus*, 67 N.Y.2d 541, 549, 496 N.E.2d 202, 505 N.Y.S.2d 43 (1986) ("light most favorable" analysis requires instruction to be given if any reasonable view of evidence would permit fact finder to find sufficient evidence for affirmative defense). It is accurate to say that "[t]his is perhaps the most lenient standard of review that exists in our law, and for good reason: the only consequence of a charge on a [defense] is that it permits the jury to resolve a factual issue, subject to all the procedural safeguards associated with verdicts based [on] insufficient evidence." *State* v. *Preston*, 248 Conn. 472, 484, 728 A.2d 1087 (1999) (*Berdon, J.*, dissenting).

Despite the authoritative (and constitutionally compelled) leniency of this standard, the majority at times

---

[4] The summary judgment analogy is apt in this case because we have said that disposition by summary judgment "is particularly inappropriate [when] the inferences [that] the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." (Internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 111, 639 A.2d 507 (1994). The same is true in criminal cases, in which "[t]he state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged." *State* v. *Rodriguez*, 180 Conn. 382, 404, 429 A.2d 919 (1980); see also *Hinds* v. *Commissioner of Correction*, 321 Conn. 56, 79, 136 A.3d 596 (2016) (when defendant's state of mind "is susceptible to more than one interpretation," it is properly decided by jury).

appears to draw the most negative possible inferences and to view the facts in a manner that overlooks or dismisses as not credible many of the details that would tend to support the defendant's claim. Ultimately, the majority concludes that no rational juror could have found that the defendant was subjectively under the influence of an extreme emotional disturbance at the time of the homicide and, therefore, declines to address whether there was sufficient evidence to establish an objectively reasonable explanation or excuse for the defendant's emotional disturbance.[5] My own review of the record convinces me that, viewing the facts in the light most favorable to the defendant, a rational juror could have concluded that the defendant had satisfied both the subjective and objective prongs of the defense. My analysis is focused on whether the defendant was in fact experiencing an extreme emotional disturbance at the time of the homicidal act, but it should be apparent from my discussion that a rational juror could have found that there was a reasonable explanation for his emotional state as well. The trial court's failure to give the instruction was therefore erroneous. Moreover, the error was harmful because, without a jury instruction on the matter, the defendant was deprived of the ability to mount his affirmative defense. I would therefore reverse the judgment of the trial court and remand for a new trial.

# I

## A

Viewed in the light most favorable to the defendant, the facts of this case and the reasonable inferences

---

[5] The majority also asserts that "[n]either party's brief addresses the objective element of the extreme emotional disturbance defense, which evaluates the reasonableness of the defendant's reaction." Footnote 6 of the majority opinion. While neither party's brief is a model of clarity with regard to the distinction between the objective and subjective prongs of the defense, both address the "cause" or " 'basis' " of the defendant's purported extreme emotional disturbance. I therefore find the briefing on both elements of the

drawn therefrom could reasonably support the follow-
ing version of events.[6] At the time of the homicide, the
defendant was at his breaking point. His troubles began
in childhood, when he was abruptly separated from his
mother, sent to live with his grandmother, and then
sent to live with his older sister when his grandmother
died. It was at this vulnerable moment in his life that
the defendant was first exposed to alcohol and drugs.
On one fateful occasion, he unknowingly consumed
phencyclidine (PCP), thinking it was marijuana. The
event had a profound impact on the trajectory of his
life, causing him to become addicted to the drug and
landing him in jail at just seventeen years old for a drug
related offense.

The defendant's addiction to PCP was all-consuming.
He was never able to hold down a job because he just
"wanted to get high and hang out." Throughout his late
teenage years and adult life, he was in and out of jail
for drug related crimes. At one point, he tried to get
sober and spent more than one month in an inpatient
drug rehabilitation program, but it was no use. The
constant drug abuse continued unabated and kept the
defendant socially isolated. Several of his former
employers "indicated that his behavior was kind of odd,
but . . . they weren't able to speak . . . too much
about it, as he kind of kept to himself." His neighbor
never got to know him because "he was . . . not very
personable." The one person he did see frequently, his
uncle, enabled his addiction by drinking with him and
allowing him to smoke PCP in his home. To make mat-
ters worse, the defendant, having already lost a brother

defense to be adequate for appellate review.

[6] It is beside the point whether I personally find this version of events to
be credible because I "do not sit as a thirteenth juror . . . ." (Internal
quotation marks omitted.) *State* v. *Bush*, 325 Conn. 272, 304, 157 A.3d 586
(2017). The issue is whether a rational juror, viewing the evidence in the
light most favorable to the defendant, could find that evidence sufficient to
support the defendant's extreme emotional disturbance defense.

in 2009, was "devastat[ed]" when his father died in 2017. He would go back to his father's house to get high and drink in the driveway. The defendant testified: "You know, it was like I couldn't leave that spot. I just couldn't leave it alone. I just really never recovered from it."

The defendant did have one saving grace: his long-term girlfriend, B, whom he described as his "one and only" and the love of his life. They moved in together in 2010. B worked full-time and provided the defendant with everything he needed. He admired her work ethic and called her "a beautiful person." Her son, J, lived with them. J viewed the defendant as "someone [he] could trust" and called him his "stepdad." The defendant loved them both and viewed them as his family.

In the months leading up to the homicide, the defendant's alcohol and drug abuse escalated. He was experiencing rapid mood swings, described by his uncle as "happiness one minute, sad and mean the next minute," and he became paranoid that B was seeing someone else. During this period, B grew increasingly frustrated with the defendant's drug abuse and inability to maintain employment. His addiction had been a consistent problem throughout their relationship, which generally made him feel "ashamed" and "like a little kid." As the defendant continued to abuse drugs and contemplated quitting his new job, B threatened to kick him out of their apartment. In a series of text messages, sent just ten days before the homicide, she warned: "You're about to fuck up what I thought was a good thing, a new beginning for us." "See this is what happens when you get high. You start not wanting to go to work. Your mind starts to play tricks on you, got you thinking I'm cheating . . . ." "I'm not doing this with you again. I knew something wasn't right but I thought to myself, no he wouldn't be that stupid, he almost lost his family once over that shit, lost his job, he wouldn't do that again but yet here we are." "I truly hope you're not out

smoking dust, if you are, you might as well pack your shit. . . ."

But the defendant was his own worst enemy. Feeling "broken," he walked off his job at Walmart. That was the final straw for B, and she demanded that he move out. When he refused, she went to stay with her mother across the street and sent her son to stay with his biological father in Pennsylvania. The defendant was left alone in the apartment for nearly one week, including during the Thanksgiving holiday. During this time, B and her mother called the police to try to evict him and bought materials to change the locks on the doors. Meanwhile, the defendant was desperately texting B and begging her for another chance, even waiting for her outside of her mother's house to ask her to come back home. She would not relent.

The evening before the homicide, B returned to the apartment with a plan "to get him out." She brought J back with her as well. Facing the immediate prospect of losing them both, the defendant stayed up the whole night drinking alcohol and smoking PCP. In the morning, in a state of exhaustion and intoxication, he asked B if she could bring him breakfast. She responded, "your f'ing car's out there, take yourself." When the defendant explained that he could not drive because he had "been drinking all night" and was "high," she reiterated her refusal and left the room. Then, the conflict suddenly turned physical. B came back toward the defendant with a knife in her hand, saying, "today, you're going to get the . . . F out of here. One way or another, you're getting out of here." The defendant was "shocked," "surprised," and "angry." They had never before had an argument involving a weapon and generally did not argue at all in J's presence.

All the defendant remembers of what happened next is wrestling the knife out of B's hand and fleeing the

scene. He "blanked out" during the homicide itself. We know what occurred only because J witnessed the defendant putting B in a chokehold, stabbing her as she attempted to get to the front door, and repeatedly saying, "it's over, it's over," while attempting to pull her back into the apartment by her hair. The police also reported that the defendant fled the scene erratically, nearly running over two officers with his vehicle as they shouted at him to stop, driving over the grass and a street curb in the process.

In the immediate aftermath of the homicide, the defendant's emotions were "going up and down . . . ." He was not sure exactly what had taken place, but he knew "something had happened" and was "petrified." Upon leaving the scene, he immediately drove to the local Dunkin' Donuts, where he was a regular customer. He needed "somewhere to think" and, as if on autopilot, sought the comfort of a familiar place that was a part of his routine. In his desperate emotional state, he also called his mother in Colorado, whom he had not seen in more than two decades, in addition to several other family members. He then drove around "aimlessly" and ended up traveling to New York City and back to Connecticut the same day. When he returned, he wandered around Hartford for several days, crying, thinking about B, and "hoping that she was okay."

B

The foregoing narrative is rooted in the evidence and reasonable inferences drawn therefrom. Perhaps most people would not credit the defendant's version of events. But it certainly would not be irrational to do so, and, for that reason, we are required to do so under the applicable standard of review. See, e.g., *State* v. *Hargett*, supra, 343 Conn. 620. The majority nonetheless concludes that no reasonable juror could find that there was sufficient proof that the defendant killed B while

under the influence of an extreme emotional distur-
bance. I disagree. In my view, the majority's analysis
misses both the forest and the trees.

The big picture overlooked by the majority is the
circumstances as *subjectively* experienced by the
defendant at the time of the homicide. Viewed in the
light most favorable to the defendant, we must consider
the factual context in which he was facing the loss of
his girlfriend of ten years and the child he regarded as
a stepson. These circumstances could be expected to
cause unusually acute emotional turmoil for many peo-
ple, and, for this defendant in particular, a jury would
be well within the bounds of reason to find that the
potential loss was likely to be experienced as cata-
strophic. Unlike people with a support network, mate-
rial resources, and a mind unimpaired by an extreme
drug addiction, the defendant was unequipped to with-
stand the crisis. The defendant was also about to lose
his sole source of income and would need to find a
new place to live with no plan for how he would survive.
Perhaps of utmost importance, it would be reasonable
to infer that the fraught nature of his situation took on
a whole new dimension when B attempted to force the
defendant out of the apartment at knifepoint.

Adding to this volatile mix was the emotional impact
of the defendant's drug abuse itself. Chronic drug abuse
is widely understood to interfere with mental and emo-
tional functioning.[7] In the defendant's case, it would be
reasonable to infer that his drug abuse was causing a
form of paranoia, leading him to believe that B was
cheating on him. B's text to him plainly indicated as
much, saying, "this is what happens when you get high.

---

[7] It is common knowledge that drug abuse interferes with emotional and
cognitive functioning. See, e.g., National Institute on Drug Abuse, Under-
standing Drug Use and Addiction DrugFacts (June, 2018), available at https://
nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction (last
visited September 17, 2025).

. . . Your mind starts to play tricks on you, got you thinking I'm cheating . . . ." Again, these facts are in the record and must be credited by the court for present purposes.

Finally, the effect of the defendant's family history cannot be discounted as relevant to the emotional state that influenced his conduct on the day that he killed B when she confronted him with a knife. It would be reasonable to infer that the defendant's sudden separation from his mother as a young child, the loss of his grandmother (who was his primary caretaker), the death of his brother, and the death of his father just two years prior to the homicide were all contributing factors to his emotional state. It does not take a psychological expert to understand that a person with an unusually troubled family history might have an outsized emotional reaction to an imminent breakup under the foregoing circumstances. In this regard, it also may have been relevant to the jury that the homicide took place at the end of November, after the defendant was left alone during the Thanksgiving holiday. The holidays are often a time of heightened emotional distress for people grappling with grief and family estrangement,[8] and it would not have been unreasonable to infer that the timing of B's departure intensified the defendant's downward spiral. A rational juror could conclude that these circumstances, combined with the defendant's loss of family, food, and shelter—suddenly instantiated by an immediate, direct threat of physical violence— prompted in the defendant an extreme emotional disturbance within the contemplation of § 53a-54a (a).

---

[8] This phenomenon, by no means limited to individuals with substance abuse or mental health problems, is well known and a frequent topic of conversation around the year-end holidays. See, e.g., D. Gillison, National Alliance on Mental Illness, The Most Difficult Time of the Year: Mental Health During the Holidays (December 20, 2021), available at https://www.nami.org/from-the-ceo/the-most-difficult-time-of-the-year-mental-health-during-the-holidays/ (last visited September 17, 2025).

Indeed, Connecticut courts have instructed juries on the extreme emotional disturbance defense in situations involving far less oppressive circumstances. See, e.g., *State* v. *Haynes*, 352 Conn. 236, 243, 336 A.3d 1139 (2025) (defendant stabbed girlfriend to death for threatening to remove his dreadlocks); *State* v. *Person*, supra, 236 Conn. 353–56 (defendant stabbed ex-girlfriend to death after she broke off short-lived engagement); *State* v. *Raguseo*, 225 Conn. 114, 117–19, 622 A.2d 519 (1993) (defendant killed victim for parking in his space); *State* v. *Casey*, 201 Conn. 174, 176–78, 513 A.2d 1183 (1986) (defendant killed neighbor for washing car and getting soapy water into defendant's newly seeded lawn). Our courts have also provided the jury instruction in situations in which the defendant claimed extreme emotional disturbance, in part, due to intoxication similar to the influence of PCP in the present case. See, e.g., *State* v. *Aviles*, 277 Conn. 281, 308, 891 A.2d 935 (there was evidence "that [the defendant] had smoked 'dust' " before homicide), cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006); *State* v. *Kaddah*, 250 Conn. 563, 577, 736 A.2d 902 (1999) (there was evidence that defendant consumed alcohol prior to homicide, which could have combined with preexisting medical conditions to make him " 'not know what he was doing' "); *State* v. *Asherman*, 193 Conn. 695, 732, 478 A.2d 227 (1984) ("on the morning of the killing [the defendant] was so clearly under the influence of some drug or alcohol . . . that persons who had never seen him before came to that conclusion"), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

This brings us to the trees, which is to say the particular guidelines that the majority correctly identifies under our case law as providing assistance in assessing whether a defendant's subjective experience may qualify as an extreme emotional disturbance. See *State* v. *Elliott*, 177 Conn. 1, 9–10, 411 A.2d 3 (1979). First, the

emotional disturbance cannot be "a mental disease or defect that rises to the level of insanity as defined by the Penal Code . . . ." Id. This necessarily means that a court may not take the issue from the jury merely because the extreme disturbance is not, in the court's estimation, sufficient to render the defendant unable "to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." General Statutes § 53a-13 (a). Second, the circumstances must have "exposed [the defendant] to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness . . . ." *State* v. *Elliott*, supra, 9. Third, the defendant must have "had an extreme emotional reaction to [the circumstances], as a result of which there was a loss of self-control, and [the defendant's] reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions." Id. Our doctrine, however, does not require a defendant to "have lost all ability to reason" in order to establish the defense. Id., 7. The guidelines "are neither conclusive nor exclusive," and the ultimate determination is for the trier of fact. (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 537, 180 A.3d 882 (2018); accord *State* v. *Forrest*, 216 Conn. 139, 148, 578 A.2d 1066 (1990).

The majority agrees that the first two *Elliott* factors are satisfied on this record. It is undisputed that the defendant was not suffering from a mental disease or defect that rose to the level of insanity at the time of the homicide. In addition, and importantly, the majority also concedes that, viewed in the light most favorable to the defendant, B's "introduction of a knife . . . elevate[d] this particular scenario to one that could allow a rational juror to find by a preponderance of the evidence that this particular defendant was exposed to an 'extremely unusual and overwhelming state.' " The

majority acknowledges that the defendant "struggled with addiction to both alcohol and PCP" and "faced the imminent loss of his home, family, and financial security," such that the prospect of his relationship ending "may arguably be understood to present a stressor beyond the 'mere annoyance or unhappiness' that would be experienced in an ordinary romantic breakup."

Nonetheless, upon reaching the third guideline, the majority concludes that there is insufficient evidence for "a rational juror to find by a preponderance of the evidence that the defendant lost self-control or that his ability to reason was overborne by extreme, intense feelings."[9] I understand that some people, perhaps most of them, would not find the defendant's defense credible. But I feel confident that there is ample room for reasonable disagreement on this record when the evidence is properly viewed in the light most favorable to the defendant.

[9] Although the matter is not before us in the present case, I pause here to draw attention to the apparent contradictions presented by the third *Elliott* factor. First, the text of the statute itself requires only that the defendant act "under the influence" of an extreme emotional disturbance. General Statutes § 53a-54a (a). To act "under the influence" of an emotional state strikes me as different from the all-encompassing condition implied by a loss of self-control or a failure of reason. See *State* v. *Elliott*, supra, 177 Conn. 9. Second, the first *Elliott* factor requires that the emotional disturbance not be "a mental disease or defect that rises to the level of insanity as defined by the Penal Code . . . ." Id. In Connecticut, the Penal Code defines legal insanity as a person's lack of "substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." General Statutes § 53a-13 (a). Given that the third *Elliott* factor and legal insanity both involve a person's volitional lack of capacity to control their actions, it would appear that the two affirmative defenses overlap in a way that makes them very difficult to disentangle. For this reason, at least one commentator has suggested that the first *Elliott* factor "is wrong and should be eliminated." J. Blue, "Defining Extreme Emotional Disturbance," 64 Conn. B.J. 473, 480 (1990). These concerns, while not raised, reinforce the importance of treating the *Elliott* factors as "understandable guidelines" rather than "elements" substituted for those specified by the legislature. (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 328 Conn. 537.

I will briefly list six of many facts from which, viewing the evidence in the light most favorable to the defendant, a rational juror could infer that the defendant's emotional state overwhelmed his self-control and faculties of reason. First, assuming that the defendant was testifying truthfully, as we must, the facts of this particular case make it reasonable to harbor real doubt that the defendant was in control of himself when he killed his source of food, shelter, and other basic life necessities. Second, the defendant testified that he "went into a blur" and "blanked out" for most of the incident. Again, assuming the veracity of his testimony, that mental state is the very embodiment of the loss of self-control or reason. Third, the defendant testified that he felt "angry," "shocked," and "surprised" when B came toward him with a knife. The third *Elliott* guideline explicitly lists "anger" as one of the "extreme intense feelings" capable of overbearing reason. *State* v. *Elliott*, supra, 177 Conn. 9. It would also be reasonable to infer that the defendant's feelings of anger and shock were substantially intensified after having stayed up the entire night consuming alcohol and PCP. Fourth, again assuming the veracity of the defendant's testimony that he had never previously argued with B in the presence of J, the very fact that the defendant engaged in violence in front of J tends to demonstrate a loss of self-control. Fifth, during the homicide, the defendant repeatedly uttered the words "it's over, it's over . . . ." It is unclear if he was referring to B's life or to their relationship, or if he was even aware of what he was saying, but this repetitive mantra could also be seen as signifying a state beyond coherent speech, which is at times symptomatic of a temporary loss of reason. Sixth, and finally, the defendant left the scene in a highly erratic fashion, nearly knocking over two police officers with his vehicle.[10]

---

[10] The majority characterizes the defendant as executing a careful maneuver "through a narrow gap between a police cruiser and a fence," minimizing the officers' testimony that the defendant had accelerated his vehicle directly

Taking all of these factual details in combination with the remainder of the record, and viewing the evidence in the light most favorable to the defendant, there is more than enough evidence for a rational juror to find that the defendant was not in control of his actions or faculties of reason at the time of the homicide.

## II

One way to see how the majority fails to view the evidence in the light most favorable to providing the instruction is by examining its characterization of the defendant's emotional state before, during, and after the homicide, as well as its misplaced focus on the defendant's consciousness of guilt. With respect to the majority's description of the defendant's actions in the days leading up the homicide, the majority quotes the testimony of B's mother. At trial, she recounted that the defendant, in an attempt to convince B to move back home, said that, if B did not return, "it was going to [be] bad, things were going to be bad, and did she really want to throw away ten years of a relationship?" The majority points to this testimony as evidence that the defendant "threatened [B] and her mother" prior to the homicide. I agree that one could interpret the prediction that "things were going to [be] bad" as an implied threat. But there are other reasonable interpretations—indeed, B's mother herself did not characterize the defendant's words as a threat—and we are required to credit these benign interpretations for present purposes. For example, the defendant's statement could reasonably be construed as meaning that "things were going to [be] bad" for *the defendant*, or that B would miss the defendant when he was gone.

---

toward them and sped over the grass to make his escape. Viewing the evidence in the light most favorable to the defendant, the same event could instead be characterized as a chaotic exit reflecting a continuing loss of emotional control, with the defendant narrowly avoiding the police cruiser and the fence by a stroke of luck.

Similarly, the majority makes much of the defendant's text messages in the week leading up to the homicide, in which he lamented the breakup in a conversation with a friend. In response to the defendant's expression of distress, his friend texted: "Yeah, bro. Keep your head up. Karma is a bitch. And it is definitely real. She will get what she did to you in the next chapter." The defendant replied: "Word, bro. Next chapter. You already know karma's a bitch." The friend texted: "There is no doubt about it. If she kept it real, it would have been a positive karma. But being that it must have been some bullshit she pulled. The same or worse of the bad will fall her way. You just do you and don't let it break you. Hold tight and hold strong." The defendant answered: "I'm holding on strong, but if anything was to ever happen to me, hold it down, my boy, for real." The majority describes the defendant's text messages as "express[ing] a desire to exact revenge against [B] . . . ." Again, maybe so. But, construed in the light most favorable to the defendant, it would be reasonable to interpret his statements as a way of saying that B would ultimately come to regret her decision. The dialogue also suggests concern about the defendant's ability to survive the breakup ("if anything was to ever happen to me") rather than any consequences for B. In my view, it is a stretch to interpret the exchange as expressing an intention on the defendant's part to personally exact revenge on B. In any event, that interpretation runs contrary to the required standard under which we must view the evidence.

The majority takes the defendant's purported threat and "desire to exact revenge" in the week leading up to the homicide to undermine the defendant's claim that he felt "shocked" and "surprised" when B attempted to force him to leave at knifepoint. Without directly saying so, the majority seems to imply that the defendant was not under the influence of an extreme emo-

tional disturbance at the time of the homicide because he had planned and intended to harm B for at least one week prior to the event. Perhaps that was the case, although I am not certain in my own mind that the evidence supports such an inference. Regardless, a rational juror could reasonably conclude otherwise on this record.

Moreover, as the majority recognizes, our case law holds that an extreme emotional disturbance "need not necessarily have been a spontaneous or sudden occurrence" and "may have simmered in the defendant's mind for a long period of time . . . ." (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 328 Conn. 533; see *State* v. *Elliott*, supra, 177 Conn. 8 (extreme emotional disturbance may be "brought about by a significant mental trauma that caused the defendant to brood for a long period of time and then [to] react violently, seemingly without provocation"). This principle has consequences for how we look at the evidence in the present case. The fact that the defendant was aware of B's desire to end the relationship does not undercut the possibility that he experienced an extreme emotional disturbance the morning of the homicide, when he was no longer able to remain in denial that the relationship was really over. He had obviously been "brood[ing]" about the topic for weeks, discussing it with his uncle, his friend, and B herself. *State* v. *Elliott*, supra, 8. His fear of the relationship ending was accompanied by increased drug consumption, mood swings, and paranoid thoughts of B seeing someone else. If we construe the evidence in the light most favorable to the defendant, a rational juror could have found that the defendant's reaction the morning of the homicide was a paradigmatic example of a simmering emotional disturbance reaching its boiling point.

The majority's failure to apply the proper standard of review is similarly demonstrated by its treatment of

the defendant's conduct following the homicide. Thus, the majority asserts that "there was no postcrime emotional breakdown during which the defendant expressed remorse," contrasting the defendant's behavior with the tearful, emotional display of the defendant at the police station in *State* v. *Person*, supra, 236 Conn 354–56. The majority also repeatedly highlights the defendant's trip to Dunkin' Donuts as evidence that his conduct was "controlled" and that he was engaging in "everyday activities" immediately following the homicide. These interpretations strike me as decidedly off base.

As an initial matter, construing the evidence in the light most favorable to the defendant, a rational juror could find that the defendant experienced a remorseful, emotional breakdown. He wandered around Hartford for several days, crying, hoping that B was okay, and making no attempt to remove his bloodstained clothing. When he eventually made his way to the doorstep of a friend he had not seen in years, he looked "sad" and told her that "all he's been doing is crying." Moreover, it is commonly understood that the aftermath of a disturbing, emotional experience might be different for different people. Cf. *State* v. *Campbell*, 149 Conn. App. 405, 430, 88 A.3d 1258 ("human reactions to stressful circumstances that give rise to a fight or flight response are matters that fall within the common experience of the average juror"), cert. denied, 312 Conn. 907, 93 A.3d 157 (2014). As counsel for the defendant stated at oral argument before this court, in assessing whether there is sufficient evidence to warrant an instruction for extreme emotional disturbance, "we don't demand that the defendant . . . collapse on the floor in a catatonic state." Our courts generally appreciate the variable nature of human responses and have routinely provided an extreme emotional disturbance instruction to defendants who did not break down in tears upon arrest. See, e.g., *State* v. *Raguseo*, supra, 225 Conn. 122 ("the

defendant had not appeared to be agitated or shaking, and responded to questions calmly"); *State* v. *Casey*, supra, 201 Conn. 177 ("the defendant was 'unusually calm,' 'like he was a shell' and . . . he 'didn't really seem to respond too much to the situation' "); *State* v. *Elliott*, supra, 177 Conn. 2–3 ("the defendant was calm and able to comprehend and answer questions").

The Dunkin' Donuts example is also illustrative in this regard. Perhaps the conduct of the defendant reflects the callousness of a cold-blooded murderer. On the other hand, if the defendant's version of events is true, a rational juror could view the defendant's trip to Dunkin' Donuts as the action of a person in a virtual stupor, hanging tightly to routine until his senses return; no person in full control of their faculties, after all, would casually stop at a local coffee shop wearing bloodstained clothing while driving the vehicle that the police had just seen speeding away from the scene of a brutal stabbing. The defendant's other conduct in the days following the homicide could reasonably suggest that he was overwhelmed and seeking comfort in familiar places and people.

I am especially wary of using a defendant's post-crime conduct to determine whether he was under the influence of an extreme emotional disturbance during the homicide itself. Such an analysis overlooks the fact that mental states are often transient and fluid. Our law insists on this psychological truism specifically as it relates to criminal mens rea. It is well established that "intent [can] be formed instantaneously and [does] not require any specific period of time for thought or premeditation for its formation." (Internal quotation marks omitted.) *State* v. *Cooper*, 227 Conn. 417, 444, 630 A.2d 1043 (1993). If we accept that a mental state can be formed in an instant, then we must also accept that it can be replaced by a different state of mind in an instant. So, too, and perhaps more so, with

human emotions, as we know from our daily observations of human behavior.

With respect to the affirmative defense of extreme emotional disturbance, moreover, a defendant need only demonstrate that he was "under the influence" of such a disturbance when he "committed the proscribed act or acts . . . ." General Statutes § 53a-54a (a); see *State* v. *Campbell*, supra, 328 Conn. 509–11 (rejecting claim that defendant was under influence of extreme emotional disturbance because evidence did not establish his emotional state "at the exact time of the shooting"). There is nothing in the statute requiring a defendant to show that the emotional disturbance continued beyond the time of the homicide itself. Emotional lability is a fact of life, more so for some than others, and it is up to the jury to determine whether it finds credible the timing and extent of any rapid changes in emotion that may be reflected in the defendant's version of events.[11]

---

[11] The majority's focus on the defendant's posthomicide conduct is particularly suspect because it relies heavily on New York precedent rather than Connecticut case law. See *Zamora* v. *Phillips*, Docket No. 04-CV-4093 (JFB), 2006 WL 2265079, *6 (E.D.N.Y. August 8, 2006) ("[i]n determining whether a [defendant] has acted out of a loss of [self-control], the court will look at the [defendant's] conduct before and after the homicide"); *People* v. *Dominguez*, 226 App. Div. 2d 391, 391, 640 N.Y.S.2d 583 (defendant's conduct after homicide was "inconsistent with the loss of control associated with extreme emotional disturbance"), appeal denied, 89 N.Y.2d 921, 677 N.E.2d 295, 654 N.Y.S.2d 723 (1996); *People* v. *Feris*, 144 App. Div. 2d 691, 692, 535 N.Y.S.2d 17 (1988) (defendant's appearance prior to homicide and his conduct following homicide were inconsistent with loss of control associated with extreme emotional disturbance). It is true, as the majority observes, that we have looked to the decisions of New York courts in construing the statutory language of § 53a-54a (a) because our murder statute "is almost a literal copy of New York Penal Law § 125.25 (1) (a) . . . ." *State* v. *Ortiz*, 217 Conn. 648, 654–55 n.6, 588 A.2d 127 (1991); see also *State* v. *Elliott*, supra, 177 Conn. 4–5 and n.3. But the decisions of our sister states do not bind this court, and we should not reflexively rely on New York precedent when there is reason to doubt its cogency. We should be particularly cautious in doing so when we move beyond the realm of statutory construction, where it often makes sense to adopt persuasive, out-of-state precedent when our statutes are nearly identical, and into the different realm of assessing which types of evidence we will consider in determining whether the proof

I am similarly unpersuaded by the majority's reliance on *State* v. *Jusino*, supra, 163 Conn. App. 634, for the proposition that " 'consciousness of guilt . . . is entirely inconsistent with an extreme emotional disturbance defense . . . .' " I cannot make sense of this notion. Evidence tending to show a defendant's consciousness of guilt is generally used to show "that a defendant is indeed guilty." (Internal quotation marks omitted.) *State* v. *Honsch*, supra, 349 Conn. 812. A person who kills while under the influence of an extreme emotional disturbance is indeed guilty—of committing the serious crime of manslaughter—and consciousness of guilt is consistent with the prescribed emotional state. Consciousness of guilt may be inconsistent with insanity under Connecticut law,[12] but the extreme emotional disturbance defense is unavailable if the defendant is legally insane. See *State* v. *Elliott*, supra, 177 Conn. 9; see also footnote 9 of this opinion. It follows that a defendant under the influence of an extreme emotional disturbance must be able to understand the wrongfulness of his actions. Additionally, a defendant need not "have lost all ability to reason" to demonstrate that he was experiencing an extreme emotional disturbance at the time of the homicide. *State* v. *Elliott*, supra, 177 Conn. 7. The defendant might well experience a loss of self-control due to extreme, intense feelings while still understanding that his conduct is wrong. It is no wonder, then, that a defendant who committed a homicide under the influence of an extreme emotional disturbance might try to evade detection in the aftermath of the crime, particularly as he begins to appreciate the enormity of the consequences of his actions.

is sufficient to permit the jury to decide whether a particular defense has been established as a factual matter. In assessing whether a defendant was under the influence of an extreme emotional disturbance at the time of a homicide, we should utilize a more nuanced approach that is sensitive to the volatile, variable and transient nature of human emotion.

[12] See General Statutes § 53a-13 (a) (defining legal insanity in relevant part as "lack[ing] substantial capacity, as a result of mental disease or defect . . . to appreciate the wrongfulness of his conduct").

Connecticut courts have consistently recognized that consciousness of guilt does not necessarily negate the presence of an extreme emotional disturbance. See, e.g., *State* v. *Aviles*, supra, 277 Conn. 285–86, 307 (court provided instruction when defendant fled and hid from police); *State* v. *Ortiz*, 217 Conn. 648, 651–52, 588 A.2d 127 (1991) (court provided instruction when defendant dragged victim's body into alley and drove away in vehicle); *State* v. *Elliot*, supra, 177 Conn. 2–3 (court provided instruction when defendant fled one-half mile away); see also *State* v. *O'Brien-Veader*, 318 Conn. 514, 520–22, 122 A.3d 555 (2015) (court provided instruction when defendant hid victim's body, cleaned up, hid bloody clothing and weapon, and socialized with friends immediately after killing victim). The majority argues that *O'Brien-Veader* "lacks any precedential value in this context because this court was not asked in that case to consider whether the evidence warranted an extreme emotional disturbance defense instruction." However, regardless of whether the issue was actually adjudicated, *O'Brien-Veader* and our other cases involving extreme emotional disturbance have enormously illustrative value in showing how the defense is implemented in our trial courts. When the instruction was given, it is reasonable to assume, at the very least, that the trial court considered it appropriate to do so. See *State* v. *Jackson*, 304 Conn. 383, 423, 40 A.3d 290 (2012). ("[i]f . . . the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury" (internal quotation marks omitted)). Moreover, if there was no objection, we must presume that the state conceded that there was sufficient evidence to merit providing the instruction to the jury.

In the present case, the fact that the defendant displayed consciousness of guilt in the hours and days following the homicide is of limited relevance to his mental state during the homicide itself and, in any event, reflects a state of mind consistent with the guilt attributable to his

commission of a homicide. A rational juror could credit the defendant's testimony that he "went into a blur" and "blanked out" while committing the crime, quickly left the scene knowing "something had happened," and felt "scared" that he might have done serious harm to or even killed B. Under such circumstances, it would make sense that the defendant was "petrified" when his mother suggested turning himself into the police and that he attempted to evade law enforcement in the days following the homicide.

Juries are well equipped to make the fact based and subtle assessments about human emotions required to determine the appropriate level of culpability under § 53a-54a (a). Indeed, the reality appears to be that, when juries are provided with the instruction, the defense of extreme emotional disturbance fails to persuade juries in most situations involving defendants who have murdered, or attempted to murder, a former wife or girlfriend. See S. Kirschner et al., "The Defense of Extreme Emotional Disturbance: A Qualitative Analysis of Cases in New York County," 10 Psychol. Pub. Policy & L. 102, 115 (2004); see also, e.g., *State* v. *Forrest*, supra, 216 Conn. 141–42; *State* v. *Fair*, 197 Conn. 106, 107–109, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1986). In any event, the legislature, not the courts, should decide if the defense should be denied to " 'anyone who kills a former girlfriend or boyfriend,' " as the majority frames the issue. Upon consideration, the legislature may agree with the majority that trial courts should serve a more active gatekeeping function to prevent juries from considering the defense in such cases.

Alternatively, were the policy issue raised in the proper forum, the legislature could decide to retain the view that prevailed when Connecticut first adopted the Model Penal Code in 1969; see Public Acts 1969, No. 828; which was the cultural high-water mark for psychological theories that could mitigate or even vitiate criminal culpability.

See generally D. Denno, "Criminal Law in a Post-Freudian World," 2005 U. Ill. L. Rev. 601, 614–31. The Model Penal Code's provisions were heavily influenced by questions involving the impact of unconscious psychological processes on criminal culpability. See id.; see also id., 640–47. Indeed, Professor Herbert Wechsler, the principal architect of the Model Penal Code, explained that the extreme emotional disturbance defense, in particular, was designed "to give full scope to what amounts to a plea in mitigation based [on] a mental or emotional trauma of significant dimensions, with the jury asked to show whatever empathy it can." H. Wechsler, "Codification of Criminal Law in the United States: The Model Penal Code," 68 Colum. L. Rev. 1425, 1446 (1968). In adopting a version of the Model Penal Code, including the extreme emotional disturbance defense, Connecticut lawmakers were interested in using the "enlighten[ed]" ideas of the time to reform the state's approach to penological intervention. Report of the Commission To Revise the Criminal Statutes (1967) p. 2; see id. ("It has been said that the quality of a society is reflected in the way in which it deals with its offenders. Whom a society marks as an offender and how it treats him measures the society's degree of enlightenment and commitment to both order and liberty. A complete revision of Connecticut's criminal laws will serve to heighten that degree of enlightenment and [to] emphasize that commitment.").

In this context, it is notable that the affirmative defense of extreme emotional disturbance, while no doubt potentially available to perpetrators of domestic violence, is also one of the few defenses available to *victims* of domestic violence who are driven to homicide under circumstances of extreme abuse. See, e.g., *Maddox* v. *Lord*, 818 F.2d 1058, 1059 (2d Cir. 1987) (defendant claimed that she shot and killed her estranged husband after his "cruelty had pushed her to the perilous edge of sanity"). Ultimately, the question of

whether a defendant meets the standard for an extreme emotional disturbance pursuant to § 53a-54a (a) is a paradigmatic question of fact for the jury. My view is simply that we must faithfully apply the proper standard of review and, in assessing whether the instruction should have been given to the jury, construe the evidence in the light most favorable to the defendant. To the extent that there are policy concerns regarding the affirmative defense itself, such considerations should properly be addressed to the legislature. See, e.g., *State v. Joyner*, 225 Conn. 450, 460, 625 A.2d 791 (1993) ("the primary responsibility for enacting the laws that define and classify crimes is vested in the legislature"); see also *Commissioner of Mental Health & Addiction Services* v. *Freedom of Information Commission*, 347 Conn. 675, 693, 299 A.3d 197 (2023) ("courts may not overlook the text of a statute in order to advance unarticulated policy considerations, even if those policies are salutary and advisable").

In light of the foregoing, I would conclude that the evidence in the record, construed in the light most favorable to the defendant, would allow a rational juror to find by a preponderance of the evidence that the defendant committed the homicide under the influence of an extreme emotional disturbance for which there was a reasonable explanation or excuse. The trial court therefore erred in failing to instruct the jury on that affirmative defense.

### III

In the present case, I need not resolve whether the trial court's failure to provide a jury instruction for extreme emotional disturbance is an error of constitutional or nonconstitutional magnitude because, under any standard, the error was harmful.[13] The jury was

---

[13] The matter is not squarely before us in this case and does not appear to be settled. We have said that an instructional error violates due process, and is of constitutional dimension, when it "confuse[s] the burden of proof, the presumption of innocence, or one of the essential elements of the crime."

deprived of the legal guidance necessary to assess whether the defendant was entitled to mitigation from murder to manslaughter under § 53a-54a (a). For all practical purposes, the court's failure to provide the instruction was fatal to the defendant's ability to prevail on his affirmative defense. See, e.g., *State* v. *Wilson*, 242 Conn. 605, 632, 700 A.2d 633 (1997) (failure to instruct jury on definition of "wrongfulness" with regard to defendant's appreciation of societal morals for purposes of legal insanity was harmful error because "the success of his defense *hinged* on whether the jury found that, at the time of the killing, he appreciated the *immorality* of his actions" (emphasis in original)); *State* v. *Casey*, 201 Conn. 174, 180, 513 A.2d 1183 (1986) (failure to instruct jury that extreme emotional disturbance need not follow "a provoking or triggering event" was fatal to defendant's ability to mount defense when his emotional disturbance purportedly arose over long period of time (internal quotation marks omitted)); cf. *State* v. *Baltas*, 311 Conn. 786, 822, 91 A.3d 384 (2014) (failure to instruct jury on certain witness' motive to testify falsely was harmful because that witness' "testimony and her credibility were critical to the defendant's convictions").

For the reasons enumerated in parts I and II of this opinion, I consider it reasonably possible that the jury

*State* v. *Adam P.*, 351 Conn. 213, 231, 330 A.3d 73 (2025). However, in *State* v. *Aviles*, supra, 277 Conn. 281, we said broadly that "jury instructions regarding the defense of extreme emotional disturbance are not of constitutional magnitude." Id., 310; see also *State* v. *Austin*, 244 Conn. 226, 244, 710 A.2d 732 (1998). This distinction often is important, of course, because it determines the standard used to decide whether a new trial is required. If an error is nonconstitutional, a new trial is proper only if "it is *reasonably probable* that the jury [was] misled," whereas, if an error is constitutional, a new trial is proper if "it is *reasonably possible* that the jury [was] misled." (Emphasis altered; internal quotation marks omitted.) *State* v. *Adam P.*, supra, 230. Additionally, if the denial of a jury instruction is not of constitutional magnitude, the defendant bears the burden of demonstrating harm, whereas the state bears the burden of demonstrating harmlessness when the instructional error implicates constitutional rights. See id., 231.

could have concluded that the defendant was entitled to mitigation under § 53a-54a (a). To begin with, the defendant was required to prove his affirmative defense only by a preponderance of the evidence. See, e.g., *State* v. *Campbell*, supra, 328 Conn. 510. Moreover, the affirmative defense of extreme emotional disturbance does not require the jury to find that it was reasonable for the defendant to have killed the victim but, rather, that it was reasonable for the defendant to have suffered an extreme emotional disturbance under the circumstances. See *State* v. *Parris*, supra, 352 Conn. 671–72 ("§ 53a-54a (a) requires that the jury determine whether the defendant acted under the influence of [an] extreme emotional disturbance and whether the disturbance itself, as opposed to the criminal act, had a reasonable explanation or excuse"). The jury could reasonably have credited the defendant's subjective account of his extreme emotional disturbance and concluded that there was an objectively reasonable explanation or excuse for the disturbance in light of his life circumstances and chronic drug addiction. I would therefore reverse the judgment of the trial court and remand the case for a new trial.